IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LISA DeSIMONE, DEBORAH R. SNOWDEN, and INEZ CLARA WASHINGTON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SELECT PORTFOLIO SERVICING, INC.,<br><br>Defendant. | Case No. 20-cv-3837<br><br>Hon. Pamela K. Chen, U.S.D.J<br>Hon. Taryn A. Merkl, U.S.M.J.<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Lisa DeSimone, Deborah R. Snowden, and Inez Clara Washington (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendant Select Portfolio Servicing, Inc. ("SPS"), alleging breach of contract, breach of the covenant of good faith and fair dealing, violations of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"), violations of the New York General Business Law ("GBL") § 349, violations of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Com. Law. Code Ann. §§ 14-201, *et seq*., violations of the Maryland Consumer Protection Act ("MCPA"), Md. Com. Law. Code Ann. §§ 13-101, *et seq*., violations of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788.13(e); § 1788.14, and violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.

As set forth in Paragraphs 12-15, there are two bases for federal subject matter jurisdiction: First, there is federal question jurisdiction over Plaintiffs DeSimone's and Washington's FDCPA claims and supplemental jurisdiction pursuant to 28 U.S.C §1367 over their state law claims.

-1-

Second, there is diversity jurisdiction over the state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

## **NATURE OF THE ACTION**

1.      SPS, a servicer of residential mortgages, routinely violates federal and state debt-collection laws and breaches the uniform terms of borrowers' mortgage agreements and deeds of trust by unlawfully and deceptively charging mortgage borrowers "EZ Pay" fees, "convenience fees," or "processing fees" (collectively, "Pay-to-Pay Fees") of up to $15 each time a consumer borrower makes a mortgage payment online or over the phone.

2.      The vast majority of the mortgage loans serviced or subserviced by SPS are secured by mortgage or deed of trust agreements conforming to the model mortgage documents of Fannie Mae/Freddie Mac, the Federal Housing Administration ("FHA") and other governmental agencies (the "Uniform Mortgages").  Many of the provisions or "uniform covenants" found in the Uniform Mortgages are the same or substantially similar, including restrictions regarding the charging of fees. In particular, the Uniform Mortgages do not expressly authorize Pay-to-Pay Fees and all prohibit the charging of fees that are in violation of the law.

3.      As a loan servicer, SPS is supposed to be compensated by the creditor for collecting borrowers' monthly payments—not via additional "service" fees that do not reflect the cost to SPS of providing such services.  In breach of Plaintiffs' and class members' Uniform Mortgages, and in violation of the FDCPA and state laws, SPS marks-up its costs of processing loan payments online or by phone above the actual cost and imposes Pay-to-Pay Fees on borrowers to create a profit center for itself.

-2-

4.     Upon investigation and belief, the actual cost for SPS to process mortgage payments made online or by phone is very low—well below the Pay-to-Pay Fees that SPS charges mortgagors.  SPS pockets the difference as pure profit.

5.     Plaintiffs Lisa DeSimone, Deborah R. Snowden, and Inez Clara Washington paid these Pay-to-Pay Fees and bring this class action lawsuit individually and on behalf of all similarly situated putative class members to recover the unlawfully charged Pay-to-Pay Fees and to enjoin SPS from continuing to charge these unlawful fees.

## THE PARTIES

6.     Plaintiff DeSimone is a citizen and resident of the State of New York, residing in Niagara County.  During the Class Periods and continuing to the present, Plaintiff DeSimone was a borrower mortgagor to a mortgage loan serviced by SPS.  During the Class Periods and continuing to the present, SPS charged Plaintiff DeSimone Pay-to-Pay Fees.  For example, on four occasions in 2017 and six occasions in 2019, SPS charged Ms. DeSimone Pay-to-Pay Fees of $7.50 for requesting payments over the phone, even after Ms. DeSimone complained about the fees to SPS.

7.     Plaintiff Snowden is a citizen and resident of the State of Maryland, residing in Prince George's County.  During the Class Periods and continuing to the present, Plaintiff Snowden was a borrower mortgagor to a mortgage loan serviced by SPS.  During the Class Periods, SPS charged Plaintiff Snowden Pay-to-Pay Fees.  For example, on six occasions in 2018, five occasions in 2019, and nine occasions in 2020, SPS charged Ms. Snowden a Pay-to-Pay Fee for requesting payments over the phone or online.  On each occasion, the amount of the fee imposed by SPS was either $15.00 or $5.00, depending on when Ms. Snowden made the payment.

8.     Plaintiff Washington is a citizen and resident of the State of California, residing in San Bernardino County. During the Class Periods and continuing to the present, Plaintiff Washington was a borrower mortgagor to a mortgage loan serviced by SPS.  During the Class Periods, SPS charged Plaintiff Washington Pay-to-Pay Fees. For example, on November 14, 2019, and December 13, 2019, SPS charged Ms. Washington a $15.00 Pay-to-Pay Fee for requesting a payment over the phone.

9.     Defendant Select Portfolio Servicing, Inc. is a residential loan servicing company with headquarters located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119.  SPS is authorized to do business by the New York Secretary of State and is licensed by the State of New York as a Mortgage Servicer and Mortgage Servicer Branch.  It services hundreds of thousands of loans.  SPS generally services distressed loans.

10.     SPS enters into service agreements with lenders, note holders, and trustees pursuant to which SPS provides servicing, subservicing and agency activities for loan portfolios.  Pursuant to its agreements with lenders, note holders, and trustees, SPS (a) acts as the agent to the lenders, note holders, and trustees, and (b) exercises the rights and responsibilities of those lenders and/or note holders pursuant to their approval.  In this manner, SPS either takes assignment of the servicing obligations in borrowers' loan agreements, and/or is in functional privity and near privity of contract with Plaintiffs and Class members, tasked with performing many of the obligations assumed by the lenders to Plaintiffs' and Class members' loan agreements.

11.     SPS represents in standard, form letters to Plaintiffs and other borrowers that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument." SPS mails standard, form mortgage statements and notice letters to

Plaintiffs and Class members with the approval and authority of its lender, note holder, and/or trustee principals.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).  The Court has supplemental jurisdiction over Plaintiffs' and the Classes' state and common law claims pursuant to 28 U.S.C. § 1367.

13.     This Court also has diversity jurisdiction over all state law claims, including the state statutory and common law claims, pursuant to the Class Action Fairness Act  of  2005 ("CAFA"),  Pub.  L.  No.  109-2,  119  Stat. 4 (codified in various sections of  Title 28 of the United States Code), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.     Plaintiffs are citizens of different states than Defendant, who is a citizen of Utah. Plaintiff DeSimone is a citizen of New York.  Plaintiff Snowden is a citizen of Maryland. Plaintiff Washington is a citizen of California.

15.     The  amount in controversy exceeds $5,000,000 and there are at least one hundred members of each of the Proposed Classes. *See* 28 U.S.C. §§ 1332(d)(2) & (d)(6).

16.     This Court has personal jurisdiction over SPS because it is a foreign corporation authorized to conduct business in New York, it regularly does business in New York, has sufficient minimum contacts with New York, and otherwise intentionally avails itself of the New York financial, real estate, and consumer markets. This purposeful availment renders the exercise of jurisdiction by this Court over SPS permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because SPS regularly transacts business and may be found in this District, and the practices complained of herein occurred in the Eastern District of New York.

18.     Venue is further appropriate in this District because this action is related to the action pending in this Court styled, *Evans v. Select Portfolio Servicing, Inc.*, E.D.N.Y. Case No. 18-cv-5985-PKC-RML.

19.     Plaintiff Washington originally filed suit in the U.S. District Court for the Central District of California on August 24, 2020, four days after the initiation this action.  *See* **Exhibit C**. SPS answered that Complaint, which is attached hereto as **Exhibit D**.  Pursuant to a stipulation endorsed by the then-presiding judge in the U.S. District Court for the Central District of California, Washington and SPS agreed to transfer the *Washington* action to this District, and accordingly, SPS agrees jurisdiction and venue are proper.

## STATEMENT OF FACTS

### The Mortgage Servicing Industry

20.     The residential mortgage lending industry is generally divided between two types of loans.  The vast majority of loans are "conforming" loans, in that they "conform" with particular uniform terms, conditions, and are for amounts under a certain threshold, set by the Federal Housing Finance Agency in coordination with Federal National Mortgage Association (FNMA or Fannie Mae) and the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac). FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises (GSEs).  In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas.  Loans that do not conform to these standards are

typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

21.     Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans.  Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market.  To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates.  While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

22.     Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan.  Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information.  Once approved to borrow the funds, the borrowers execute these standard loan documents.  Because the GSEs will accept for securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

23.     After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, which in turn bundle it with other conforming loans to sell as securities to investors in the form of a mortgage-backed security — bond-like securities that are secured by the homes.  While the original mortgage lender may itself service the securitized and pooled loan, often that lender or the GSEs to which the loan is sold will retain a large mortgage servicing company that specializes in the actual management and administration of mortgages to

perform the servicing obligations required by the Uniform Mortgages.  As part of the contractual or assignment process, the mortgage servicer or subservicer and the lender or GSE negotiate a fee schedule to compensate the mortgage servicer or subservicer for collecting payments and other servicing and collections work.  The borrower has no role in this process.

24.     The fees paid to mortgage servicers or subservicers by the lender or GSEs come in a variety of forms.  First, mortgage servicers or subservicers negotiate a servicing fee, which is typically a percentage of approximately .25-.5% of a borrower's outstanding mortgage balance on an annual basis.  The average balance on a mortgage loan in this country is $208,000.  Thus, if a mortgage servicer agrees to perform work for .5% of the borrowers' balance, and a borrower has a $208,000 balance on the mortgage, the servicer will receive $1,040 a year, or $86.67 a month to accept the payment from the borrower and apply it to the balance. The servicing agreement between the servicer or subservicer and lender or GSEs also includes other fee schedules negotiated between those contracting parties and may include things like allowing the holder of the mortgage loans to retain late fees (capped by the GSEs and set in the standardized loan templates) and the ability to retain interest on borrowers' escrow payments.

25.     Consumer borrowers have no say in who their designated loan servicers will be. Nor are they required to pay for loan servicing beyond paying their mortgage and agreed interest.

26.     Uniform Mortgages contemplate the monthly payment of mortgages by check or other electronic payment methods.  Payments by check can cost loan servicers like SPS anywhere between $1 and $4 a month in processing and other fees, per 2015 report by the Association for Financial Professionals.  Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited.  Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight.

Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.  Because it is so expensive to process check transactions, every mortgage servicer in the country offers borrowers the option of having their monthly payment automatically debited via the ACH system.  While offered under the auspice of improving services for borrowers, the cost of an ACH transaction is typically only few cents and its electronic nature reduces overhead costs enormously.

27.     Still, for many borrowers, the automatic ACH system is impractical as it requires a borrower to agree to a fixed amount and date for the debit each month out of a pre-determined bank account, and increases a borrower's vulnerability to banking errors.  Borrowers may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to pay extra on their mortgage at times and prefer to make that decision on a monthly basis.  Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

28.     To reduce the expense caused by borrowers who pay as required but prefer more control than the automatic ACH option provided to them, many servicers offer to borrowers the option to pay by phone or online.  This option typically costs servicers less than 50 cents a transaction, far less than the cost of paying by check, and like the automatic ACH method, includes increased electronic efficiencies.

29.     Because the cost savings is so significant, most mortgage servicing companies, as well as third-party debt collectors, allow consumers to make their mortgage payments over the phone or online, and many loan servicers offer these services for free.  While phone and online payment methods are marketed as convenient for consumers, they are permitted by the Uniform

Mortgages (*see e.g.*, **Exhibits A & B**, DeSimone Mortgage and Snowden Deed of Trust at Section 1 permitting payments by cash, check, money order or Electronic Funds Transfer), and are also more cost-effective for the servicers over accepting paper checks.  Thus, mortgage servicers find their profits increase substantially by simply increasing choices to customers.

**SPS Charges Illegal Pay-to-Pay Fees**

30.     SPS is a loan servicer and subservicer that operates around the country.  SPS buys mortgage servicing rights or contracts to subservice mortgage servicing with a primary servicer and exercises those mortgage servicing rights to collect mortgage payments, charge fees, enforce the mortgage or deed of trust and Note, as well as initiate foreclosure on properties that secure the mortgage or deed of trust and Note.  SPS does not disclose the terms of its servicing agreements publicly.

31.     SPS admits that "it sometimes collects mortgage payments, charges fees, and initiates foreclosure on properties securing the deeds of trust and notes of borrowers whose loans it services."  **Exhibit D,  ¶**34.  SPS further admits that, "SPS exercises these rights where there is a valid assignment that is granted to SPS in an asset purchase agreement." *Id*.

32.     As part of SPS's regular business practice of acquiring servicing rights to mortgages, it acquires mortgages in default for purposes of servicing them, including collecting payments on that mortgage debt both during the time the mortgage is in default and after it has been brought current.

33.     Each time a borrower whose loan is serviced by SPS makes a payment over the phone or online, SPS charges the borrower a Pay-to-Pay Fee of up to $15.00.

34.      These Pay-to-Pay Fees are materially higher than the costs incurred by SPS, can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits

for SPS. Typically, a loan servicer will use a vendor to process transactions; these third-party vendors, such as Western Union and ACI Worldwide, charge other loan servicers $.50 or less per internet or phone transaction. The Association for Financial Professionals wrote a report in 2015 stating that the median cost for processing these transactions was between 37 and 75 cents, much less than its estimated check processing costs of $1 to $4. SPS admitted in answering Plaintiff Washington's original *Class Action Complaint* that it does not use any vendor or third party to process the transaction, and thus, its costs are likely lower than the median.

35.  SPS's imposition of Pay-to-Pay Fees also amounts to double-charging. Thus, to build on the example in Paragraph 24 above, where SPS hypothetically negotiated a .5% servicing fee, SPS agreed to receive that rate regardless of how the borrower elects to pay, knowing that it was obligated to accept payments via check from every borrower. Thus, out of the $86.67 it receives each month out of the loan payment being made by the borrower, it could incur as much as $4 in costs to process check payments, leaving $82.67 to cover other overhead costs and for its profit. SPS double charges borrowers by charging additional Pay-to-Pay Fees, up to $15 for each phone or online payment, over and above SPS's negotiated servicing fees agreed with the lender, GSE or primary servicer.

36.  SPS purports to be providing a valuable service to borrowers to which they would not otherwise be entitled. That is wrong, as the Uniform Mortgages permit borrowers to pay by Electronic Funds Transfer. *See e.g.*, **Exhibits A& B**, DeSimone Mortgage and Snowden Deed of Trust at Section 1. Further, borrowers already pay SPS to service their loans by paying their mortgages. If SPS wants to make more money, it can negotiate a larger fee from the lender, primary servicer or GSE. It should not get to double dip – pocketing the servicing cut while upcharging borrowers for doing the work they have already been paid to do.

-11-

37.     The Pay-to-Pay Fees charged are materially higher than the costs incurred by SPS to process the phone and online payments, providing millions of dollars in unlawful profits for SPS.

38.     SPS gets away with these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal.  Borrowers are forced to have SPS as their loan servicer.

**SPS Charged Plaintiff DeSimone Pay-to-Pay Fees**

39.     Plaintiff DeSimone's Mortgage Agreement, dated April 7, 2005, is attached hereto as **Exhibit A**. Plaintiff DeSimone's Mortgage Agreement incorporates standard language from Fannie Mae model mortgages.

40.     SPS services Plaintiff DeSimone's mortgage loan on behalf of its lender principal, Deutsche Bank National Trust Company, as trustee for the Morgan Stanley Home Equity Loan Trust 2005-3 Mortgage Pass-Through Certificates, Series 2005-3.

41.     While initially serviced by another loan servicer, SPS assumed servicing of DeSimone's loan in September 2014.  As confirmed by documents produced by SPS in this litigation, DeSimone was in arrears on her mortgage when SPS assumed servicing her loan.  A September 14, 2014 letter from SPS to Plaintiff DeSimone states: "Select Portfolio Servicing, Inc. (SPS), the mortgage servicer on the above referenced account, identified that you are in default under the terms of your mortgage or deed of trust (security instrument)."  SPS_001540-41. The first loan statement sent by SPS to Plaintiff DeSimone listed her loan as "Past Due."

42.     On six occasions in 2019 and four occasions in 2017, SPS imposed Pay-to-Pay Fees on Plaintiff DeSimone for requesting payments by phone.  On each occasion, the amount of the fee imposed by SPS was $7.50, reduced from a total charge of $15.00 as a result of Plaintiff

DeSimone's complaints about the Pay-to-Pay Fees, and was debited directly from Plaintiff DeSimone's bank account. SPS imposed those fees on Plaintiff DeSimone each time she paid her mortgage by phone, instead of having it automatically deducted from her bank account. Plaintiff DeSimone approved the payments of her mortgage from her bank account but objected to the Pay-to-Pay Fees.

43.     The costs associated with processing Plaintiff DeSimone's online or telephonic mortgage payments were much lower than the $7.50 Pay-to-Pay Fees SPS imposed. These Pay-to-Pay Fees were an effort by SPS to profit from Plaintiff DeSimone making her monthly mortgage payments. On each occasion when SPS imposed a Pay-to-Pay Fee on Plaintiff DeSimone, SPS was acting as a debt collector and represented itself as such in standard written form communications. For example:

     a.    SPS imposed a Pay-to-Pay Fee on Plaintiff DeSimone on August 22, 2019. In the statement prepared and sent by SPS confirming the imposition of that Pay-to-Pay Fee, SPS admitted, "This is an attempt to collect a debt." That same statement reflected that SPS was attempting to collect allegedly past due debts from Plaintiff DeSimone.

     b.    SPS imposed a Pay-to-Pay Fee on Plaintiff DeSimone on July 12, 2019. In the statement prepared and sent by SPS confirming the imposition of that Pay-to-Pay Fee, SPS admitted, "This is an attempt to collect a debt." That same statement reflected that SPS was attempting to collect allegedly past due debts from Plaintiff DeSimone.

**SPS Charged Plaintiff Snowden Pay-to-Pay Fees**

44.     Plaintiff Snowden's Deed of Trust, dated December 23, 2005, is attached hereto as **Exhibit B**. Plaintiff Snowden's Deed of Trust incorporates standard language from Fannie Mae model mortgages.

45.     SPS services Plaintiff Snowden's mortgage loan on behalf of its lender principal.

46.     On nine occasions in 2020, five occasions in 2019, and six occasions in 2018, SPS imposed Pay-to-Pay Fees on Plaintiff Snowden.  On each occasion, the amount of the fee imposed by SPS was either $15.00 or $5.00 and was debited directly from Plaintiff Snowden's bank account.  SPS imposed those fees on Plaintiff Snowden each time she paid her mortgage online or by phone, instead of having it automatically deducted from her bank account.  Plaintiff Snowden approved the payments of her mortgage from her bank account but objected to the Pay-to-Pay Fees.

47.     When Plaintiff Snowden questioned SPS about the amount of the Pay-to-Pay Fees, SPS explained that if Plaintiff paid early in the month, she was charged the $5.00 fee, and if she paid later in the month, she was charged the $15.00 fee.  This demonstrates that the Pay-to-Pay is arbitrary and not related to an actual cost incurred by SPS to process the mortgage payment.

48.     The costs associated with processing Plaintiff Snowden's online or telephonic mortgage payments were much lower than the $5.00 or $15.00 Pay-to-Pay Fees SPS imposed.  These Pay-to-Pay Fees were an effort by SPS to profit from Plaintiff Snowden making her monthly mortgage payments.  On each occasion when SPS imposed a Pay-to-Pay Fee on Plaintiff Snowden, SPS was acting as a collector and represented itself as such in standard written form communications.

**SPS Charged Plaintiff Washington's Pay-to-Pay Fees**

49.     On or January 23, 2008, Steven Lewis Washington and Inez Clara Washington, a married couple, purchased a home in Adelanto, California, through a loan from Bank of America, N.A., secured by a mortgage on the property (the "Deed of Trust").

50.     Plaintiff Washington's Deed of Trust, dated January 24, 2008, is attached hereto as **Exhibit C-1**.

51.     Uniform Fannie Mae/Freddie Mac multistate notes, which are widely used in California, define "Default" as the failure to make a mortgage payment on the due date: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default." **Exhibit C-2 at Section 6(B)**.  The form note also includes a 15-day grace period.  Plaintiff's mortgage is secured by a Note containing materially identical provisions.

52.     On information and belief, Fannie Mae or Freddie Mac assigned Ms. Washington's loan servicing to SPS.

53.     By letter dated November 5, 2019, Ms. Washington received notice that SPS was assigned the servicing rights to the loan.  As servicer, SPS has the right to collect payments and perform services for the borrower on behalf of the lender.  Her Deed of Trust provides that the "Loan Servicer" possesses a "partial interest in" the Note, which may be transferred.  *See* **Exhibit C-1 at Section 20**.  Her Deed of Trust further provides that, "[t]he covenants and agreements of this Security Instrument shall bind (except as provided in section 20) and benefit the successors and assigns of Lender." *Id*., **Section 13**.[1]  SPS's admissions to the allegations this paragraph as

---

[1] Section 20 provides: "The note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects periodic payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations

made in its Answer to Plaintiff Washington's original *Class Action Complaint* are set forth in **Exhibit D**, ¶ 41.

54.     SPS became bound as an assignee to the Deed of Trust at the time it acquired the servicing rights.  In order for SPS to exercise rights under the Deed of Trust to collect Ms. Washington's mortgage payments, there must be an assignment of mortgage servicing rights.

55.     SPS set up and on-boarded the Ms. Washington's loan on November 8, 2019 as a "New Loan Set-Up."  At that time, Ms. Washington's loan was at least 38 days delinquent.  admits this.  **Exhibits C & D**, ¶ 43.

56.     On the same day, November 8, 2019, when on-boarding the loan SPS charged Ms. Washington a late fee of $20.66.  Under the terms of the Note, a late fee may only be charged when Plaintiff is in default.

57.     Under the terms of the Deed of Trust, collection costs may only be charged in connection with a default.  **Exhibit C-1 at Section 14**.

58.     When SPS acquired the serving rights right to collect payments and perform services for the borrower on behalf of the lender, Ms. Washington's loan was in default as evidenced by the SPS statement dated November 15, 2019 (the "November Statement") which stated that "as of November 15, you are 45 days delinquent on your mortgage loan." Ms. Washington's November and December statements are attached hereto as **Exhibit C-3**.

---

under the Note, this Security Instrument, and Applicable Law.  There might also be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change under the Loan Servicer, Borrower will be given written notice of the change . . . .  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser."

59.     On November 14, 2019, Ms. Washington made a loan payment over the phone in the amount of $206.67 and was charged a Pay-to-Pay Fee in the amount of $15.00.  According to SPS, this payment satisfied the payment due September 1, 2019.  SPS admitted this.  **Exhibits C & D**, ¶ 47.

60.     On December 13, 2019, Ms. Washington made a loan payment over the phone in the amount of $206.67 and was charged a Pay-to-Pay Fee in the amount of $15.00.  According to SPS, this payment satisfied the payment due October 1, 2019.  SPS admitted this.  *Id.*

61.     In accordance with the statement from SPS dated April 14, 2020 (the "April Statement"), Ms. Washington made loan payments on January 13, 2020 (which satisfied the payment due November 1, 2019), February 15, 2020 (which satisfied the payment due December 1, 2019), and March 11, 2020 (which satisfied the payment due January 1, 2020) and were charged Pay to Pay Fees each time they made these payments.  The April Statement is attached as **Exhibit C-4**.  SPS admits these fees were charged on the dates specified.  **Exhibits C & D, ¶ 49**.

62.     The April Statement advised Ms. Washington that "as of April 14, 2020, you are 73 days delinquent on your mortgage loan.  *See* **Exhibit C-4**.

63.     Ms. Washington's mortgage payments are due on the 1st of the month each and every month, and a late charge will be assessed if payments are not received during the 15-day grace period. Each of  Ms. Washington's payments on November 14, 2019, December 13, 2019, January 13, 2020, February 15, 2020, and March 11, 2020, were made on past-due amounts and after the grace period, and while the mortgage was due and owing.  SPS admits these fees were charged on the dates specified and that payments were made on past-due amounts after the grace period.  **Exhibits C & D, ¶ 51**.

-17-

## APPLICABLE LAW

### The FDCPA

64.     The purpose of the FDCPA is "to eliminate abusive debt collection practices . . . and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692.

65.     The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," which includes the false representation of "the character, amount, or legal status of any debt." *Id.* § 1692e.

66.     The FDCPA also prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt," including "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1).

67.     Courts have interpreted § 1692f(1) as prohibiting the charging of any amount not expressly authorized in the agreement creating the debt or affirmatively permitted by some state or federal law.  *See e.g.*, *Alexander v. Carrington Mortg. Servs., LLC*, No. 20-2359, 2022 WL 164018, at *5 (4th Cir. Jan. 19, 2022).

68.     Regulators and attorneys general have also taken issue with Pay-to-Pay Fees.  As stated by the New York Attorney General, representing a coalition of 33 state attorneys general, including those of Maryland and California, Pay-to-Pay Fees that are not authorized by borrowers' loan agreements are unlawful:

-18-

"When Americans utilize online or phone payments to pay off their monthly mortgages, [mortgage servicer] PHH benefits, but instead of passing those savings on to homeowners PHH charged illegal fees and increased costs for nearly one million Americans," said Attorney General James. "PHH's sole purpose is to collect and process homeowners' payments, which it already makes millions of dollars from each year. In the 21st century, when most Americans pay their bills online or by phone, to charge fees on top of what they are already being paid is not only unethical, but unlawful. …

For years, PHH charged nearly one million homeowners an illegal fee — ranging from $7.50 to $17.50 — each time a homeowner made a monthly mortgage payment online or by phone, despite most Americans paying their mortgages one of these two ways. Nowhere in these homeowners' mortgage contracts is there authorization for such fees and PHH does not charge "processing" fees for any other customers, including those who pay by check or those who set up automatic debit payments. Charging fees not mentioned in the mortgage contract is illegal and, under New York's mortgage servicing regulations, explicitly forbidden.

Source: https://ag.ny.gov/press-release/2021/attorney-general-james-leads-bipartisan-coalition-fighting-protect-nearly-one (Jan. 29, 2021).

69.     In the past decade, New York's Department of Financial Services has entered into five consent orders or agreements with lenders charging similar unlawful Pay-to-Pay Fees.[2]

70.     In October 2021, the Consumer Financial Protection Bureau ("CFPB"), which has been vested with the authority to promulgate rules and interpretations under the FDCPA since 2010, filed an *amicus* brief in a matter before the Ninth Circuit agreeing that the FDCPA prohibits the charging of any amount not expressly authorized by the agreement creating the debt or otherwise affirmatively permitted by state law.   The CFPB explained:

The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay fees at issue here, whenever no other

---

[2] *See* Consent Order to Ocwen Financial Corporation, Ocwen Loan Servicing LLC for the following dates: March 27, 2017, Dec 22, 2014, Dec. 5, 2012, and Dec. 15, 2011, available at https://www.dfs.ny.gov/industry_guidance/enforcement_actions_mortgage.

law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

*Thomas-Lawson v. Carrington Mort. Servs.*, 9ᵗʰ Cir. No. 21-55459, Dkt. 22 (*Brief of Amicus Curiae Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants*) *at* 11.  The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

71.     The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." *Id*. § 1692a(3).

72.     The FDCPA defines "debt collector" as "any person who uses . . . any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect . . . debt owed . . . or asserted to be owed or due another." *Id.* § 1692a(6).

73.     The FDCPA defines communication as "conveying of information regarding a debt directly or indirectly to any person through any medium." *Id.* § 1692a(2).

74.     The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that] are primarily for personal, family, or household purposes." *Id.* § 1692a(5).

**<u>New York Mortgage Servicing Regulations</u>**

75.     Under New York regulations, "[a] servicer may only collect a fee if it is for a service that is actually rendered to the borrower, reasonably related to the cost of rendering that service." 3 N.Y.C.R.R. § 419.5(b).

-20-

**California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act")**

76.     The Rosenthal Act is a remedial statute [that] should be interpreted broadly in order to effectuate its purpose.

77.     The Rosenthal Act defines "debt collector" as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ. Code § 1788.2(c).

78.     The Rosenthal Act defines a "consumer debt" as "money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." Cal. Civ. Code § 1788.2(f).

79.     The Rosenthal Act defines "consumer credit transaction" as "a transaction between a natural person and another person in which property, services or money is acquired on credit by that natural person from such other person primarily for personal, family, or household purposes." Cal. Civ. Code § 1788.2(e).

80.     The Rosenthal Act prohibits "Collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14(b).

81.     The Rosenthal Act also makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

82.     The Rosenthal Act makes it illegal for any entity covered by it to violate the federal FDCPA. Cal. Civ. Code § 1788.17.

**The California Unfair Competition Law**

83.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

84.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

85.     In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

**The Maryland Consumer Debt Collection Act (MCDCA)**

86.     The MCDCA provides that "[i]n collecting or attempting to collect an alleged debt a collector may not" "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist," Md. Code Ann., Com. Law § 14-202(8), or "[e]ngage in any conduct that violates § § 804 through 812 of the federal Fair Debt Collection Practices Act," *id.* § 14-202(11). Section 808 of the FDCPA has been codified at 15 U.S.C. § 1692f.

87.     The MCDCA defines "collector" to mean "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction." Md. Code Ann., Com. Law § 14-201(b).

88.     The MCDCA defines "consumer transaction" to mean "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." Md. Code Ann., Com. Law § 14-201(c).

89.     Unlike the definition of "debt collector" under the FDCPA, the MCDCA does not require that the debt be in default for an entity to act as a "collector" under the statute. *Alexander v. Carrington Mortg. Servs., LLC*, No. 20-2359, 2022 WL 164018, at *4 (4th Cir. Jan. 19, 2022).

**The Maryland Consumer Protection Act (MCPA)**

90.     The MCPA prohibits "any unfair, abusive, or deceptive trade practice . . . in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services" or "in the collection of consumer debts." Md. Code Ann., Com. Law § 13-303(1).

91.     A violation of the MCDCA is a per se violation of the MCPA. Md. Code Ann., Com. Law § 13-301(14)(iii).

**State "1692f" Statutes**

92.     Many other states have adopted debt collection statutes that contain language mirroring the FDCPA, 15 U.S.C. § 1692f(1).  These states (the "Fee Prohibiting States") and the relevant statutes are:

    a.    Texas prohibits a debt collector from "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer." Tex. Fin. Code Ann. § 392.303(2).

    b.    West Virginia prohibits "[t]he collection of or the attempt to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating or modifying the obligation and by statute or regulation." W. Va. Code Ann. § 46A-2-128(d).

    c.    Pennsylvania prohibits "[t]he collection of any amount, including any interest, fee, charge or expense incidental to the principal obligation,

unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 73 Pa. Stat. Ann. § 2270.4(b)(6)(i).

d.     Oregon makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect interest or other charges or fees that exceed the actual debt unless the agreement, contract or instrument that creates the debt expressly authorizes, or a law expressly allows, the interest or other charges or fees." Or. Rev. Stat. Ann. § 646.639(2)(n).

e.     Iowa prohibits the "collection of or the attempt to collect interest or other charge, fee or expense incidental to the principal obligation unless the interest or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation and is legally chargeable to the debtor, or is otherwise legally chargeable." Iowa Code Ann. § 537.7103(5)(d).

f.     New Hampshire makes it unlawful for a debt collector to "[c]ollect[] or attempt[] to collect any interest or other charge, fee or expense incidental to the principal obligation unless such interest or incidental fee, charge or expense is expressly authorized by the agreement creating the obligation and legally chargeable to the debtor." N.H. Rev. Stat. Ann. § 358-C:3(X).

**BREACH OF LOAN AGREEMENTS DUE TO VIOLATIONS OF APPLICABLE LAW**

93.     SPS collects the Pay-to-Pay Fees even though it knows that such fees are not authorized under Uniform Mortgages and that it therefore has no right to collect them.

94.     Like other borrowers whose mortgages are serviced by SPS, Plaintiffs' Uniform Mortgages incorporate standard language from Fannie Mae and Freddie Mac model mortgages. And like other Fannie Mae Mortgages, Plaintiffs' Uniform Mortgages provide that the lender and

its agents (including SPS), may not charge any borrower (including Plaintiffs) fees not approved in the Uniform Mortgages, which incorporate the restrictions imposed by federal law and the law where the property is located. In Plaintiff DeSimone's case, that state law is New York law. In Plaintiff Snowden's case, that state law is Maryland law. In Plaintiff Washington's case, that state law is California law.

95. Fannie Mae and Freddie Mac assign servicing rights with restrictions on the fees that a loan servicer may charge. Every loan servicing assignment from Fannie Mae or Freddie Mac is made under the restrictions of Fannie Mae Guidelines for Single Family Loans (the "Guidelines"). The Guidelines prohibit Pay-to-Pay Fees as an illegal fee for "facilitating routine borrower collections" and even if the Guidelines allowed a fee, SPS must keep written policies that explain how the amount of the fee related to the actual cost of providing the service. Considering the low cost of the service, SPS's Pay-to-Pay Fee amounts are unrelated to the actual cost of providing the service to borrowers.

96. Section 14 of Plaintiff DeSimone's Uniform Mortgage provides, in relevant part:

**14. Loan Charges**. Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. *Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law*. [Emphasis added].

97. Section 14 of Plaintiff Snowden and Washington's Uniform Mortgages provide:

-25-

**14. Loan Charges**.  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. *Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law*.  [Emphasis added].

98.    Section 16 of Plaintiff DeSimone's Uniform Mortgage provides:

**16. Law That Governs this Security Instrument; Word Usage**. *This Security Instrument is governed by federal law and the law of New York State*.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract.  If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.  [Emphasis added].

99.    "Applicable Law" is defined in Plaintiff DeSimone's Uniform Mortgage at page 2, definition (I) as: "All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions[.]"

100.    Similarly, Section 16 of Plaintiff Snowden's Uniform Mortgage provides:

**16. Governing Law; Severability; Rules of Construction**. *This Security Instrument is governed by federal law and the law of the jurisdiction in which the Property is located*. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can be given effect, without the conflicting provision.  [Emphasis added.]

101.   "Applicable Law" is defined in Plaintiff Snowden's Uniform Mortgage at page 1, definition (J) as: "All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions[.]"

102.   Similarly, Section 16 of Plaintiff Washington's sta Uniform Mortgage provides:

**16. Governing Law; Severability; Rules of Construction.** *This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.*  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.  [Emphasis added.]

103.   "Applicable Law" is defined in Plaintiff Washington's Uniform Mortgage at page 2, definition (I) as: "all controlling applicable federal, state and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions."

104.   SPS breached Sections 14 and 16 of Plaintiffs' Uniform Mortgages by imposing and charging the Pay-to-Pay Fees that are not *expressly authorized* by Plaintiffs' Uniform Mortgages, in contravention of the FDCPA, 15 U.S.C. § 1692(e) and (f), compliance of which federal law is incorporated into the mortgage and deed of trust agreements.

105.   SPS further breached Sections 14 and 16, respectively, of the Plaintiffs DeSimone and Plaintiff Washington's Uniform Mortgages by imposing and charging the Pay-to-Pay Fees that are not *expressly authorized* by Plaintiffs' s Uniform Mortgages and that are not *reasonably related to the cost of rendering the service* and are therefore prohibited by New York's mortgage servicing regulations, 3 N.Y.C.R.R. § 419.5(b) (previously codified as 3 N.Y.C.R.R. § 419.10(b)),

or California's Rosenthal Act, *see* Cal. Civ. Code § § 1788.13(e), 1788.14(b), 1788.17, compliance of which state law is incorporated into Plaintiff DeSimone's and Plaintiff Washington's mortgage and deed of trust agreements.

106.    The above paragraphs are contained in the Uniform Covenants section of the Plaintiffs' and Class members' standard mortgage and deed of trust agreements.  SPS thus breached its contracts on a class-wide basis.

## TOLLING

107.    Equitable tolling applies to Plaintiffs' claims to the extent SPS misrepresented and concealed the true nature of the fees charged to Plaintiffs' and Class members' mortgage accounts.

## CLASS ACTION ALLEGATIONS

108.    Plaintiffs DeSimone, Snowden and Washington bring this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of a Nationwide Class defined as follows:

> **Nationwide Class**: All persons (1) with a residential mortgage loan securing a property in the United States, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust agreements incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) and who paid a fee to SPS for making a loan payment by telephone, an Interactive Voice Response system ("IVR"), or the internet, during the applicable statutes of limitations through the date a class is certified.

109.    Plaintiffs DeSimone and Washington further seek to represent a **Nationwide Default Subclass,** defined as all members of the Nationwide Class whose loans were in default when SPS began servicing or subservicing the loan.

110.    Plaintiffs Snowden and Washington bring this action pursuant to Federal Rule of Civil Procedure, Rule 23(a), 23(b)(2), and (b)(3) on behalf of a multi-state Class defined as follows:

**Fee-Prohibiting State Class:** All persons (1) with a residential mortgage loan securing a property in the United States, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust agreements incorporating uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) who reside in Fee Prohibiting State (5) who paid a fee to SPS for making a loan payment by telephone, an Interactive Voice Response system ("IVR"), or the internet, during the applicable statutes of limitations through the date a class is certified.

111.    Plaintiff DeSimone brings this action pursuant to Federal Rule of Civil Procedure,

Rule 23(a), 23(b)(2), and (b)(3) on behalf of the New York Class defined as follows:

**New York Class:** All persons (1) with a residential mortgage loan securing a property in New York, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust agreements incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) and who paid a fee to SPS for making a loan payment by telephone, an Interactive Voice Response system ("IVR"), or the internet, during the applicable statutes of limitations through the date a class is certified.

112.    Plaintiff Snowden brings this action pursuant to Federal Rule of Civil Procedure,

Rule 23(a), 23(b)(2). and (b)(3) on behalf of the Maryland Class defined as follows:

**Maryland Class:** All persons (1) with a residential mortgage loan securing a property in Maryland, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust agreements incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) and who paid a fee to SPS for making a loan payment by telephone, an Interactive Voice Response system ("IVR"), or the internet, during the applicable statutes of limitations through the date a class is certified.

113.    Plaintiff Washington brings this action pursuant to Federal Rule of Civil Procedure,

Rule 23(a), 23(b)(2). and (b)(3) on behalf of the California Class defined as follows:

**California Class:** All persons (1) with a residential mortgage loan securing a property in California, (2) serviced or subserviced by SPS, (3) with mortgage or deed of trust incorporating standard uniform covenants from Fannie Mae/Freddie Mac, FHA or similar government-backed model mortgages, (4) and who paid a fee to SPS for making a loan payment by telephone, an Interactive Voice Response system ("IVR"), or the internet, during the applicable statutes of limitations through the date a class is certified, (5) in connection with a payment made after the due date.

-29-

114.    Excluded from the Classes are SPS, any entity in which SPS has or had a controlling interest or which have or had a controlling interest in any SPS, SPS's employees, officers, directors, legal representatives, assigns, and successors; the judicial officer(s) to whom this matter is assigned and their immediate family; and Class members who timely opt-out of any certified 23(b)(3) opt-out Class.

115.    Plaintiffs reserve the right to modify or amend the definition of the Classes before the Court determines whether certification is appropriate.

**Numerosity (Rule 23(a)(1))**

116.    The proposed Class is so numerous that joinder of all members would be impracticable; SPS services hundreds of thousands of loans. The in dividual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by SPS.   The precise number of Class members can be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.   Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**Commonality (Rule 23(a)(2))**

117.    There are core questions of law and fact that are common to Plaintiffs' and Class members' claims.

118.    These common questions predominate over any questions that go particularly to any individual member of the Classes. Among such common questions of law and fact are the following:

a.    whether Class members' loan agreements prohibited Pay-to-Pay Fees;

-30-

b.      whether SPS was in near or functional privity or privity of contract with Class members;

c.      whether SPS was operating as an agent for its lender / note holder / trustee principals;

d.      whether SPS charged Class members Pay-to-Pay Fees;

e.      whether the Pay-to-Pay Fees were in excess of the actual cost of the fees, *i.e*., the costs and charges incurred by SPS to accept mortgage payments by ACH;

f.      whether SPS breached Class members' loan agreements and violated state and federal laws;

g.      whether SPS's cost to process Pay-to-Pay Transactions is less than the amount that it charged for Pay-to-Pay Fees;

h.      Whether Plaintiffs and the Class members were damaged by SPS's conduct;

i.      Whether Plaintiffs and Class members are entitled to restitution;

j.      Whether Plaintiffs and Class members are entitled to attorneys' fees and costs; and

k.      the appropriate remedies due by SPS to Class members.

**Typicality (Rule 23(a)(3))**

119.    Plaintiffs are members of the Classes they seek to represent.  Plaintiffs' claims are typical of claims of the other Class members because of the similarity, uniformity, and common purpose of SPS's unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of SPS's unlawful conduct.

**Adequacy of Representation (Rules 23(a)(4) and 23(g))**

120.    Plaintiffs are adequate representatives of the Classes and will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent them. There is no hostility between Plaintiffs and the unnamed Class members.   Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

121.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, who are experienced in class action litigation, fraud litigation, and mortgage litigation, and who have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))**

122.    The questions of law or fact common to Plaintiffs and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on SPS's common fraudulent and unlawful conduct based on uniform policies involving uniform (and form) mortgage documents.

123.    Moreover, common questions of law predominate, including whether the assessment of Pay-to-Pay Fees violates the mortgage agreements and are assessed in bad faith.

124.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even though some individualized damages determinations may be necessary.

125.    A class action is superior to individual actions.

126.    Joinder of all Class members would create extreme hardship and inconvenience for the affected borrowers as they are dispersed geographically and reside across multiple states.

127.    Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions.

128.    There are no known individual Class members who are interested in individually controlling the prosecution of separate actions.

129.    The interests of justice will be well served by resolving the common disputes of potential Class members in one forum. Individual suits would not be cost effective or economically maintainable, and the action is manageable as a class action.

**Requirements of Fed. R. Civ. P. 23(b)(2)**

130.    Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Classes.

131.    SPS acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

### SPS WAS PROVIDED PRE-FILING NOTICE OF THIS LAWSUIT

132.    Prior to the filing of the original *Class Action Complaints* in this action and the *Washington* action, counsel for Plaintiffs provided notice of this action to SPS or legal counsel for SPS and an opportunity to cure SPS's unlawful conduct.  SPS did not cure.

133.    SPS was provided further notice of Plaintiffs' claims in Plaintiff DeSimone's original *Class Action Complaint* and Plaintiffs' DeSimone's and Snowden's *First Amended Class Action Complaint* filed and served in this action.  It still has not cured its unlawful conduct.  SPS has demonstrated through its conduct and refusal to cure, including its defense of this and other

-33-

lawsuits challenging its pay-to-pay practices, that further notice is, and at all points would have been, futile.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF FAIR DEBT COLLECTION PRACTICES ACT**
**(On Behalf of Plaintiffs DeSimone and Washington and the Nationwide Default Subclass)**

134.    Plaintiffs DeSimone and Washington repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

135.    Plaintiffs DeSimone and Washington and the Nationwide Default Subclass are "consumers" as defined by 15 U.S.C. § 1692a(3) because Plaintiffs and the Nationwide Default Subclass members purchased homes by mortgage primarily for personal, family, or household use.

136.    SPS is a debt collector as defined by 15 U.S.C. § 1692a(6) because as a servicer it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, *i.e.*, the holders of the mortgage debts.  SPS also regularly acquires mortgage loans that are in default, and as such, is in the business of collecting on defaulted debt.

137.    As alleged above, SPS acquired the rights to service and collect payments on the mortgage debt of Plaintiffs DeSimone and Washington while those mortgages were in arrears or default, and regularly collected loan payments on behalf of those Plaintiffs' lenders, which were due monthly.

138.    As to all members of the Nationwide Default Subclass, SPS acquired servicing rights to their Uniform Mortgages while in default, and regularly collected loan payments on behalf of these Subclass members' lenders, including Plaintiffs DeSimone's and Washington's lenders, and which were due monthly.

139.    SPS does not enjoy any "safe harbor" protection for loan servicers.  For example, it acquired the rights to service Washington's loan at a time when Plaintiff Washington was at least 38 days delinquent and was in default according to the terms of the Note.

**SPS violated § 1692f of the FDCPA**

140.    The FDCPA, 15 U.S.C. § 1692f provides, in relevant part:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1)    The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. . . .

141.    Plaintiffs DeSimone's and Washington's standard mortgage and deed of trust agreements, as well as the agreements of the Nationwide Default Subclass, did not expressly authorize the Pay-to-Pay Fees.  Nor are the Pay-to-Pay Fees permitted by any law.

142.    SPS violated 15 U.S.C. § 1692f when it collected Pay-to-Pay Fees from Plaintiffs DeSimone and Washington and from qualifying members of the Nationwide Default Subclass despite their standard mortgage and deed of trust agreements not expressly authorizing such fees.

**SPS Violated § 1692e(2)(A) of the FDCPA**

143.    The FDCPA, 15 U.S.C. § 1692(e) provides, in relevant part:

False or misleading representations

A debt collector may not use any false, deceptive or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .

(2)    The false representation of –
        (A) the character, amount, or legal status of any debt; . . .

(10)    The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer . . .

SPS violated 15 U.S.C. § 1692e(2)(A) when it misrepresented the amount, character, and status of Plaintiffs DeSimone's and Washington's and qualifying members of the Nationwide Class members' mortgage debt.

144.    SPS's violations of Section 1692f and false representations that it was entitled to collect Pay-to-Pay Fees from Plaintiffs DeSimone and Washington and qualifying members of the National Class further violated 15 U.S.C. § § 1692e(2) and e(10).

145.    As a result of SPS's violation of 15 U.S.C. § § 1692e and 1692f, Plaintiffs DeSimone and Washington and qualifying members of the Nationwide Subclass members were harmed monetarily and are entitled to actual damages, plus statutory damages under 15 U.S.C. § 1692k, together with reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(On Behalf of All Plaintiffs and the Nationwide Class (including the Nationwide Default Subclass), the Fee-Prohibiting State Class, the New York Class, the Maryland Class, and the California Class (collectively "the Classes"))**

146.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

147.    Plaintiffs and the other members of the Classes have executed Uniform Mortgages for loans serviced or subserviced by SPS.

148.    In cases where SPS purchased the servicing rights and/or took assignment of those servicing obligations under the mortgage or deed of trust agreements, SPS is in privity with the borrowers.

149.    In cases where SPS services the loans as an agent for the lender / primary service or GSE, SPS is in functional privity or near privity of contract with Plaintiffs and Class members as a result of its fulfillment of its principals' duties and obligations running from Plaintiffs' and

Class members' loan agreements, including but not limited to: (i) the collection of all monies due under those loan agreements; (ii) preparing and transmitting monthly statements concerning those loan agreements; (iii) performing all or nearly all customer service functions concerning those loan agreements; (iv) engaging in written and oral communications concerning those loan agreements; (v) enforcing their principals' rights of foreclosure under the loan agreements.

150.    Conceding the assignment of its powers to act as its principals' agents and near-privity relationships with Plaintiffs and the members of all Classes, SPS stated in communications to Plaintiffs and all Class members that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument."

151.    SPS breached the terms of the Uniform Mortgages by imposing Pay-to-Pay Fees on Plaintiffs and the members of all Classes, which fees are not authorized or permitted by Plaintiffs' and any Class members' Uniform Mortgages.

152.    The GSEs in assigning the loan to SPS, restricts the fees that SPS may collect under the assignment through the Guidelines.  The Guidelines prohibit any fee for "facilitating routine borrower collections."  Even if any fee may be charged, SPS may only collect a fee for "special services" and the Guidelines require SPS to keep written policies concerning how the amount of the fee relates to the actual cost of providing the service.  SPS's Pay-to-Pay Fees do not relate to the actual cost of SPS providing the Pay-to-Pay service.  Moreover, the Guidelines are, at most, a private term between the GSEs and SPS; they are not applicable law nor a contract creating the debt, and do not bind borrowers.

153.    By imposing and charging Pay-to-Pay Fees that are not *expressly authorized* by Plaintiffs' and Class members' standard mortgage or deed of trust agreements, SPS violated the applicable laws of the United States and state law, including but not limited to the FDCPA, 15

U.S.C. § 1692(e) and (f); the laws of the Fee-Prohibiting States; and the laws of California, New York, and Maryland.  Accordingly, SPS breached Sections 14 and 16 of Plaintiffs' and Class members' Uniform Mortgages by failing to comply with "Applicable Law" in servicing the mortgages, which includes federal law and the law of the states in which the property is located.

154.   SPS further breached Sections 14 and 16 of Plaintiffs DeSimone's and Washington's, and the New York and California Classes' Uniform Mortgages by imposing and charging Pay-to-Pay Fees which are not *expressly authorized* by Plaintiffs' standard mortgage or deed of trust agreements and not *reasonably related to the cost of rendering the service* and therefore prohibited by the 3 N.Y.C.R.R. § 419.5(b) (previously codified as 3 N.Y.C.R.R. § 419.10(b)), and California's Rosenthal Act, *see* Cal. Civ. Code § § 1788.13(e), 1788.14(b), 1788.17, compliance of which state law is incorporated into Plaintiff DeSimone and Plaintiff Washington's mortgage and deed of trust agreements

155.   Plaintiffs and the other members of the Classes have been damaged as a direct result of SPS's breaches of contract. Those damages comprise the wrongful imposition and collection of Pay-to-Pay Fees from Plaintiffs and Class members.

156.   Plaintiffs the other members of the Classes were each at all relevant times in compliance with and not in breach of their Uniform Mortgages and other loan agreements, or alternatively, SPS elected its remedy to continue to perform under those loan agreements even after asserting a breach by Plaintiffs and other members of the Classes.

157.   Even if the Pay-to-Pay Fees could somehow be construed as a default-related fee under Section 9 ("Protection of Lender's Interest in the Property and Rights Under This Security Instrument") of Plaintiffs' and Class members' standard mortgage or deed of trust agreements, that section permits only "amounts disbursed by lender" to become the debt of the borrower.  *See*

**Exhibits B and C-1 Section 9**; *accord* **Exhibit A at Section 9** (limited to amounts the "Lender spends").  By assessing more than the amounts it actually disbursed to the balance of Plaintiffs' can Class members' mortgage and deed of trust agreements, SPS breached Section 9.

158.    Because the above provisions are contained in the "Uniform Covenants" section of the Uniform Mortgages, SPS has breached their contracts on a Class-wide basis as to the members of all Classes.

159.    As a result of SPS's breaches of contract, Plaintiffs and the Nationwide Class (including the Nationwide Default Class), the Fee-Prohibiting State Class, the New York Class, the Maryland Class, and the California Class seek actual damages, equitable remedies including declaratory relief, an injunction, disgorgement, restitution, and imposition of a constructive trust, in addition the payment of attorneys' fees and reasonable expenses.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of All Plaintiffs and the Nationwide Class (including the Nationwide Default Subclass), the Fee-Prohibiting State Class, the New York Class, the Maryland Class, and the California Class (collectively "the Classes"))**

160.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully set forth herein.

161.    Plaintiffs and the other members of the Classes have executed Uniform Mortgages for loans serviced by SPS.

162.    In cases where SPS purchased the servicing rights and/or took assignment of those servicing obligations under the mortgage or deed of trust agreements, SPS is in privity with the borrowers.

163.    In cases where SPS services the loans as an agent for the lender / primary service or GSE, SPS is in functional privity or near privity of contract with Plaintiffs and Class members

as a result of its fulfillment of its principals' duties and obligations running from Plaintiffs' and Class members' loan agreements, including but not limited to: (i) the collection of all monies due under those loan agreements; (ii) preparing and transmitting monthly statements concerning those loan agreements; (iii) performing all or nearly all customer service functions concerning those loan agreements; (iv) engaging in written and oral communications concerning those loan agreements; (v) enforcing the principals' rights of foreclosure under the loan agreements.

164.    Conceding the assignment of its powers to act as its principals' agents and near-privity relationships with Plaintiffs and Class members, SPS stated in communications to Plaintiffs and Class members that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument."

165.    A covenant of good faith and fair dealing is implied in every contract, including the standard form mortgage agreements serviced and administered by SPS. This covenant imposes upon each party a duty of good faith and fair dealing in the performance of the contract.

166.    Where an agreement affords one part the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

167.    SPS has abused its obligations of good faith and fair dealing by abusing the discretion afforded by Plaintiffs' and Class members' Uniform Mortgages by imposing improper Pay-to-Pay Fees.

168.    As a direct and proximate result of the aforementioned breaches of the covenant and duties of good faith and fair dealing, Plaintiffs and the Classes have suffered damages.

169.    Plaintiffs the other members of the Classes were each making payments on their loans at the time the Pay-to-Pay Fees were charged, and at all relevant times otherwise in

compliance with and not in breach of their Uniform Mortgages and other loan agreements, or alternatively, SPS elected its remedy to continue to perform under those loan agreements even after asserting a breach by Plaintiffs and other members of the Classes.

170.    As a result of SPS's breach of the covenant and duties of good faith and fair dealing, Plaintiffs and the Fee-Prohibiting State Class, the Nationwide Class, the New York Class, the Maryland Class, and the California Class seek actual damages, equitable remedies including an injunction, disgorgement, restitution and imposition of a constructive trust, in addition the payment of attorneys' fees and reasonable expenses.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(On Behalf of Plaintiff DeSimone and the New York Class)**

171.    Plaintiff DeSimone repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

172.    Plaintiff DeSimone brings this cause of action for violations of GBL § 349 individually and on behalf of the New York Class.

173.    Plaintiff DeSimone and New York Class members are "persons" within the meaning of GBL § 349(h).

174.    GBL § 349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

175.    SPS's acts, practices, misrepresentations, and omissions alleged herein constitute acts, uses, or employment by SPS of deception, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement

of merchandise, and with the subsequent performance, of SPS in violation of GBL § 349, making deceptive and unfair acts and practices illegal.

176.   SPS's conduct is deceptive because it is likely to mislead consumers and the public by making them believe, falsely, that SPS was permitted to impose and collect Pay-to-Pay Fees.

177.   SPS's representations were materially false and misleading and likely to deceive the consuming public because SPS knew, or reasonably should have known, and failed to disclose, that it was not permitted to impose or collect Pay-to-Pay Fees.

178.   The deceptive acts and practices of SPS have directly, foreseeably, and proximately caused damages and injury to Plaintiff DeSimone and the other members of the New York Class.

179.   In addition to pecuniary losses, Plaintiff DeSimone and New York Class members suffered actual harm as a result of SPS's violations GBL § 349(a) and other consumer protection statutes, including but not limited to, the annoyance, harassment, time, frustration, anger, and anxiety due to SPS's deceptive acts and practices.

180.   Plaintiff DeSimone and the New York Class are entitled to pursue claims against SPS for damages, statutory damages, treble damages, exemplary damages, injunctive relief, costs and attorney's fees pursuant to GBL § 349(h) to redress SPS's violations of GBL § 349(a).

181.   New York Class members who were sixty-five years of age or older at the time of SPS's violations of GBL § 349 are entitled to pursue additional remedies pursuant to GBL § 349-c to redress SPS's violations of GBL § 349(a) perpetrated against elderly persons.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE MARYLAND CONSUMER DEBT COLLECTION ACT**
**(Md. Com. Law. Code Ann. § § 14-201 *et seq.*)**
**(On Behalf of Plaintiff Snowden and the Maryland Class)**

182.    Plaintiff Snowden repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

183.    The MCDCA defines "collector" as "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction." Md. Com. Law. Code Ann. § 14-201(b). The MCDCA applies to SPS because it is collecting or attempting to collect alleged debts arising out of consumer transactions.

184.    Plaintiff Snowden and the Maryland Class engaged in consumer transactions when they took out mortgages in order to acquire real property for personal, family, or household uses. Plaintiff Snowden took out the mortgage loan secured by her property and now serviced by SPS for personal, family, or household uses. *See* Md. Com. Law. Code Ann. § 14-201(c).

185.    The MCDCA prohibits "collectors" such as SPS from claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist. *Id*. § 14-202(8).

186.    SPS knew that the mortgage agreements of Plaintiff Snowden and the Maryland Class did not expressly authorize SPS to collect Pay-to-Pay Fees, and at most permitted SPS to assess amounts "disbursed" to process the transactions (i.e., debiting the borrower's checking account for the mortgage payment). Despite this knowledge, SPS represented to Plaintiff Snowden and the Maryland Class members that SPS had the right to collect the Pay-to-Pay Fees and collected them from Plaintiff Snowden and the Maryland Class.

187.    The MCDCA also makes it illegal for a collector to engage in conduct that violates the federal FDCPA. *Id*. § 14-202(11). The FDCPA makes it an illegal, unfair practice for a debt collector to undertake the "collection of any amount (including any interest, fee, charge, or expense

-43-

incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

188.     The mortgage agreements of Plaintiff Snowden and the Maryland Class do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the mortgage agreements permit SPS to collect the actual amount disbursed to process the underlying transactions which triggered the Pay-to-Pay Fee. Although the mortgage agreements do not expressly authorize collection of the Pay-to-Pay Fees, SPS collected such fees anyway. In so doing, SPS violated the MCDCA.

189.     As a result of SPS's violations of the MCDCA, Plaintiff Snowden and the Maryland Class were harmed.

### SIXTH CAUSE OF ACTION
### VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
#### (On Behalf of Plaintiff Snowden and the Maryland Class)

190.     Plaintiff Snowden repeats and realleges each preceding paragraph of this Complaint as if fully set forth herein.

191.     Plaintiff Snowden brings this cause of action for violations of the Maryland Consumer Protection Act ("MCPA"), Md. Com. Law. Code Ann. § § 13-101, *et seq*., individually and on behalf of the Maryland Class whose properties subject to the mortgages serviced by SPS are located within the State of Maryland.

192.     The MCPA prohibits unfair or deceptive trade practices, including in the collection of consumer debts. *See* Md. Com. Law. Code Ann. § 13-301; *id.* § 13-303(5).

193.     SPS is a merchant within the meaning of the MCPA and is subject to all of the MCPA's provisions prohibiting unfair or deceptive trade practices including those in Md. Com. Law. Code Ann. § § 13-303 and 13-301.

194.    The MCPA defines "consumer" as an "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." *Id.* § 13101(c)(1). Plaintiff Snowden and the Maryland Class are "consumers" within the meaning of the MCPA because they are purchasers of consumer realty and recipients of consumer credit. *See id.* § 13-101(c)(1).

195.    The mortgage loans taken out by Plaintiff Snowden and the Maryland Class are "consumer credit" under the MCPA because they are credit debts or obligations securing real property used primarily for personal, household, family, or agricultural purposes. *Id.* § 13-101(d).

196.    Under the MCPA, "consumer debt" and "consumer realty" mean, "respectively, . . debts or obligations" and "real property" "which are primarily for personal, household, family, or agricultural purposes." *Id.* § 13-101(d)(1).

197.    SPS's failure to disclose and its concealment from Plaintiff Snowden and members of the Maryland Class of the material facts as set forth herein constitutes unfair and deceptive trade practices in violation of the MCPA.

198.    SPS's failure to disclose and concealment of the material facts to Plaintiff Snowden and the Maryland Class that the amount SPS charged for the Pay-to-Pay Fee had no reasonable relationship to, and was far in excess of, the cost, if any, incurred by SPS for actual services performed in debiting Plaintiff's and the other member of the Maryland Class's mortgage payments from their bank accounts, tended to and did deceive Plaintiff and members of the Maryland Class and constitutes an unfair and deceptive trade practice in violation of MCPA.

199.    In addition, a violation of the MCDCA is a *per se* violation of the MCPA. *Id.* § 13-301(14)(iii). By violating the MCDCA, SPS also violated the MCPA.

-45-

200.     As a result of SPS's unfair and deceptive trade practices, Plaintiff Snowden and the

Maryland Class were charged Pay-to-Pay Fees in amounts ranging from $5.00 to $15.00 that were

not permitted by their mortgage agreements, were in violation of the MCDCA, and were not

reasonably related to the actual cost, if any, incurred by SPS in debiting Plaintiff Snowden's and

the Maryland Class's bank accounts for mortgage payments.

### SEVENTH CAUSE OF ACTION
### VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT
#### (On Behalf of Plaintiff Washington and the California Class)

201.     Plaintiff Washington repeats and realleges each preceding paragraph of this

Complaint as if fully set forth herein.

202.     The Rosenthal Act applies to SPS because it regularly engages in debt collection as

defined by the statute. Cal. Civ. Code § 1788.2.

203.     SPS knew that the Pay-to-Pay Fees were not expressly set out in Plaintiff

Washington's standard mortgage and deed of trust agreement, or the agreements of the California

Class members, yet it collected them anyway.

204.     The Rosenthal Act makes it illegal to represent that consumer debt "may be

increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added

to the existing obligation." Cal. Civ. Code § 1788.13(e).

205.     By assessing Pay-to-Pay Fees, SPS represented that the mortgage loan debts of

Plaintiff Washington and the California Class members may be increased by the addition of the

Pay-to-Pay Fees, even though Pay-to-Pay Fees may not be legally added to the existing obligation.

206.     This conduct violated the Rosenthal Act.

207.     The Rosenthal Act also prohibits "collecting or attempting to collect from the

debtor the whole or any part of the debt collector's fee or charge for services rendered, or other

-46-

expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

208.    When SPS collected Pay-to-Pay Fees from Plaintiff Washington and the California Class members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

209.    By charging Pay-to-Pay Fees, a portion of which it retains, SPS acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

210.    The Deed of Trusts of Plaintiff Washington and the California Class members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

211.    Although the Deed of Trusts of Plaintiff and the California Class members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

212.    In so doing, SPS violated 15 U.S.C. § 1692f.

213.    The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17. By violating the federal FDCPA, SPS violated the Rosenthal Act

214.    Plaintiff Washington and the Class Members were harmed when SPS violated the Rosenthal Act through the above-described conduct.

215.    As a result of each and every violation of the Rosenthal Act, Plaintiff Washington

and the California Class members are entitled to any actual damages pursuant to Cal. Civ. Code

§ 1788.30(a); statutory damages for a knowing or willful violation, pursuant to Cal. Civ. Code

§ § 1788.30(b), 1788.17, and 1788.32, to the full extent provided by law; and reasonable attorneys'

fees and costs under Cal. Civ. Code § 1788.30(c).

## EIGHTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### (On Behalf of Plaintiff Washington and the California Class)

216.    Plaintiffs repeat and reallege each preceding paragraph of this Complaint as if fully

set forth herein.

217.    The California Unfair Competition Law "UCL" defines unfair business

competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code

§ 17200.

### Unlawful Prong

218.    A business act or practice is "unlawful" under the UCL if it violates any other law

or regulation.

219.    SPS's conduct violates the Rosenthal Act and the FDCPA. These violations are

sufficient to support Plaintiff Washington's and the California Class's claim under the unlawful

prong of the UCL.

220.    The Rosenthal Act applies to SPS because it regularly engages in debt collection as

defined by the statute. Cal. Civ. Code § 1788.2.

221.    SPS knew that the Pay-to-Pay Fees were not expressly set out in the Deed of Trust

or the Deed of Trusts of the other California Class members, yet it collected them anyway.

-48-

222. The Rosenthal Act makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

223. By assessing Pay-to-Pay Fees, SPS represented that the mortgage loan debts of Plaintiff Washington and the California Class members may be increased by the addition of the Pay-to-Pay Fees, even though Pay-to-Pay Fees may not be legally added to the existing obligation.

224. This conduct violated the Rosenthal Act.

225. The Rosenthal Act also prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

226. When SPS collected Pay-to-Pay Fees from Plaintiff Washington and the California Class members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

227. By charging Pay-to-Pay Fees, a portion of which it retains, SPS acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

228. The Deed of Trusts of Plaintiff Washington and the California Class members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

229.    Although the Deed of Trusts of Plaintiff Washington and the California Class members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

230.    In so doing, SPS violated 15 U.S.C. § 1692f.

231.    The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17. By violating the federal FDCPA, SPS violated the Rosenthal Act.

232.    As a result of the above conduct, Plaintiff Washington and the California Class have suffered economic injury, and SPS has been unjustly enriched at their expense. SPS has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

233.    Through its unlawful acts and practices, SPS has improperly obtained money from Plaintiff Washington and the members of the California Class. As such, Plaintiff Washington requests that the Court cause SPS to restore the money to Plaintiff Washington and the California Class and enjoin SPS from continuing to violate the Rosenthal Act, FDCPA, and UCL. Plaintiff Washington's mortgage continues to be serviced by SPS, and she intends to make mortgage payments over the phone and online in the future. Absent an injunction, Plaintiff Washington and the California Class members may be irreparably harmed and/or denied an effective and complete remedy.

**Unfair Prong**

234.    In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

235. SPS's actions constitute "unfair" business practices because, as alleged above, SPS engaged in the immoral, unethical, oppressive, and unscrupulous practice of charging Pay-to-Pay Fees not authorized by the Uniform Mortgages or applicable law. SPS's unfair practice was substantially injurious to consumers, who were forced to pay between $5-$15 each time they wished to make payments by phone. Because SPS charged fees well above the actual cost of providing phone payment services, there are no countervailing benefits to consumers or competition that outweigh the injuries suffered by Plaintiff Washington and the California Class.

236. As a result of the above conduct, Plaintiff Washington has suffered economic injury, and SPS has been unjustly enriched at the expense of Plaintiff Washington and members of the California Class. SPS has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

237. Through its unlawful acts and practices, SPS has improperly obtained money from Plaintiff Washington and the California Class members. As such, Plaintiff requests that the Court cause SPS to restore the money to Plaintiff and the California Class and enjoin SPS from continuing to violate the UCL in the future. Plaintiff's mortgage continues to be serviced by SPS, and she intends to make mortgage payments over the phone or online in the future. Absent an injunction, Plaintiff and the California Class members may be irreparably harmed and/or denied an effective and complete remedy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against SPS as follows:

A.    Certifying the Classes pursuant to Federal Rule of Civil Procedure 23, certifying Plaintiffs as the representative of the Classes, and designating their counsel as counsel for the Classes;

B.      Actual and compensatory damages for injuries suffered by Plaintiffs and Class Members;

C.      Awarding Plaintiffs and Class Members statutory and exemplary damages where permitted;

D.      Awarding Plaintiffs and Class Members restitution and disgorgement where permitted;

E.      Injunctive relief, including, but not limited to, removal of charges incurred by Plaintiffs and Class Members for the Pay-to-Pay Fees;

F.      Reasonable attorneys' fees and costs of this action and pre-judgment interest; and

G.      Such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs and Classes demand a trial by jury on all issues so triable.

Dated: February 10, 2022
    New York, New York

**GISKAN SOLOTAROFF
& ANDERSON LLP**

*/s/ Catherine E. Anderson*
Catherine E. Anderson, Esq.
Email: canderson@gslawny.com
Oren Giskan, Esq.
Email: ogiskan@gslawny.com
90 Broad Street, 10th Floor
New York, NY 10004
Tel: (212) 847-8315

**LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP**
Rachel Geman, Esq.
Email: rgeman@lchb.com
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (212) 355-9500

**SHANBERG, STAFFORD
 & BARTZ LLP**
Ross E. Shanberg, Esq.
Email: rshanberg@ssbfirm.com
5031 Birch Street
Newport Beach, CA 92660
Tel: (800) 519-9810

**TUSA P.C.**
*/s/ Joseph S. Tusa*
Joseph S. Tusa, Esq.
Email: joseph.tuspc@gmail.com
P.O. Box 566
55000 Main Road, 2nd Floor
Southold, NY 11971
Tel. (631) 407-5100

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei
Email: hzavareei@tzlegal.com
Kristen G. Simplicio (*pro hac vice*)
Email: ksimplicio@tzlegal.com
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Tel. (202) 973-0900

**BAILEY & GLASSER LLP**
Todd A. Walburg
Email: twalburg@baileyglasser.com
James L. Kaufman (*pro hac vice*)
Email:  jkaufman@baileyglasser.com
475 14th Street, Suit 610
Oakland, CA 94612
Tel. (510) 207-8633

***Counsel for Plaintiffs and Proposed Class
Counsel***