# EXHIBIT C

Hassan A. Zavareei (SBN 181547)
Kristen G. Simplicio (SBN 263291)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: 202-973-0900 (p)
Facsimile: 202-973-0950 (f)
hzavareei@tzlegal.com
ksimplicio@tzlegal.com

Todd A. Walburg (SBN 213063)
BAILEY & GLASSER LLP
475 14th Street, Suite 610
Oakland, California 94612
Telephone: (510) 207-8633
Facsimile: (510) 463-0241
twalburg@baileyglasser.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INEZ CLARA WASHINGTON, *on behalf of herself and all others similarly situated,* | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SELECT PORTFOLIO SERVICING, INC., | **Action for Breach of Contract; Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.; Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788 et seq, Fair Debt Collection Practices Act, 15 U.S.C. §1692f and §1692e ("FDCPA").** |
| Defendant. | |

Plaintiff Inez Clara Washington, ("Ms. Washington" or "Plaintiff") on behalf of herself and all others similarly situated, alleges breach of contract, violations of the Rosenthal Fair Debt Collection Practices Act, and violations of the Unfair Competition Law against Defendant Select Portfolio Servicing, Inc. ("SPS"). In support of these claims, Plaintiff states as follows:

**NATURE OF THE ACTION**

1. Defendant SPS is an industry leading servicer of residential mortgages, servicing residential mortgages nationwide and throughout the State of California.

2. But SPS impermissibly profits from the homeowners it purports to service by charging and collecting illegal payment processing fees when borrowers make their monthly mortgage payments by telephone or online ("Pay-to-Pay Transactions"). SPS routinely violates state debt collection law and breaches the uniform terms of borrowers' mortgages ("Uniform Mortgages") by charging and collecting these illegal processing fees ("Pay-to-Pay Fees").

3. SPS charges a Pay-to-Pay Fee of up to $15 each time a customer makes a payment online or over the phone.

4. As a servicer, SPS is supposed to be compensated out of the interest paid on each borrower's monthly payment—not via additional "service" fees that do not reflect the cost to SPS of providing such services. Under California law, SPS cannot mark-up the amounts it pays third parties to provide borrowers' services and impose unauthorized charges not explicitly included in the deed of trust to create a profit center for itself. None of the Pay-to-Pay Fees are permitted by the deed of trust, and, therefore, SPS violates California law by charging those fees. And, by charging these unauthorized Pay-to-Pay Fees, SPS violates its contractual obligations to its borrowers.

5. Despite its uniform contractual obligations to charge only fees explicitly allowed under the mortgage, applicable law, and only those amounts actually disbursed, SPS leverages its position of power over homeowners and demands exorbitant Pay-to-Pay Fees. Upon investigation and belief, the actual cost for SPS to process online mortgage payment transactions is very low—well below the Pay-to-Pay Fees that SPS charges mortgagers. SPS pockets the difference as pure profit.

6.     Plaintiff Inez Clara Washington paid these Pay-to-Pay Fees, and brings this class action lawsuit individually and on behalf of all similarly situated putative class members to recover the unlawfully charged Pay-to-Pay Fees and to enjoin SPS from continuing to charge these unlawful fees.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over SPS because SPS does business in California, and performed the wrongful acts giving rise to this lawsuit in California, as described in this Complaint.

8.     Venue is proper in this District because SPS does business in this District and the causes of action asserted herein arose in this District.

9.     Subject matter jurisdiction exists under the Class Action Fairness Act because diversity exists between the defendant and at least one class member and the amount in controversy exceeds $5,000,000.

## PARTIES

10.     Plaintiff Inez Clara Washington is a natural person residing in California who has a mortgage loan serviced by SPS. Ms. Washington makes loan payments over the phone, and each time she does so, SPS charges her a Pay-to-Pay Fee of $15.00. For example, on November 14, 2019, and December 13, 2019, SPS charged Plaintiff a $15.00 Pay-to-Pay Fee for making a payment over the phone.

11.     Defendant SPS is a Utah corporation with a principal place of business located in Utah.

## APPLICABLE LAW

**ROSENTHAL ACT**

12.     The Rosenthal Act is a remedial statute [that] should be interpreted broadly in order to effectuate its purpose.

13.     The Rosenthal Act defines "debt collector" as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ. Code §1788.2(c).

14.     The Rosenthal Act defines a "consumer debt" as "money, property or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." The term "consumer debt" includes mortgage debt. Cal. Civ. Code §1788.2(f).

15.     The Rosenthal Act defines "consumer credit transaction" as "a transaction between a natural person and another person in which property, services or money is acquired on credit by that natural person from such other person primarily for personal, family, or household purposes." Cal. Civ. Code §1788.2(e).

16.     The Rosenthal Act prohibits "Collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14(b).

17.     The Rosenthal Act also makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

18.     The Rosenthal Act makes it illegal for any entity covered by it to violate the federal FDCPA. Cal. Civ. Code § 1788.17.

**THE CALIFORNIA UNFAIR COMPETITION LAW**

19.     The UCL defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

20.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

21.     In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

**THE FAIR DEBT COLLECTION PRACTICES ACT**

22.     The purpose of the FDCPA is "to eliminate abusive debt collection practices . . . and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692.

23.     The FDCPA prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," which includes the false representation of "the character, amount, or legal status of any debt." *Id.* § 1692e.

24.     The FDCPA also prohibits debt collectors from "unfair or unconscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692f(1).

25.     The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

26.     The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." *Id.* § 1692a(3).

27.     The FDCPA defines "debt collector" as "any person who uses . . . any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect . . . debt owed . . . or asserted to be owed or due another." *Id.* § 1692a(6).

28.     The FDCPA contains an exclusion from the term "debt collector" for "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity:… (iii) concerns a debt which was *not in default at the time it was obtained* by such person." *Id* (emphasis added).

29.     The FDCPA defines communication as "conveying of information regarding a debt directly or indirectly to any person through any medium." *Id.* § 1692a(2).

30.     The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that] are primarily for personal, family, or household purposes." *Id.* § 1692a(5).

## FACTUAL ALLEGATIONS

### *The Mortgage Servicing Industry*

31.     Mortgage lenders rarely service their own loans. In many cases, lenders specialize in the origination of the loan, but they are not equipped to handle the day-to-day administrative tasks that come with a mortgage. Instead of managing these duties in-house, they assign the servicing rights of

their loans to a designated servicer—a company that specializes in the actual management and administration of mortgages.

32. A mortgage servicer is a company that, in turn, handles the day-to-day administrative tasks of a mortgage loan, including receiving payments, sending monthly statements and managing escrow accounts.

33. There are two main, assignable rights under a Deed of Trust and Note. There are ownership rights as the lender under the agreement. Separately, there are mortgage servicing rights that entitle the Lender to enforce the Deed of Trust, collect mortgage loan payments, and charge fees allowed by the Note and Deed of Trust.

34. SPS is a loan servicer that operates around the country. SPS buys mortgage servicing rights and exercises those mortgage servicing rights to collect mortgage payments, charge fees, enforce the Deed of Trust and Note, as well as initiate foreclosure on properties that secure the Deed of Trust and Note. SPS exercises these rights where there is a valid assignment that is granted to SPS in an asset purchase agreement. SPS is a privately-held company and does not disclose the terms of its asset purchase and assignment agreements publicly.

35. Each time a mortgage borrower whose loan is serviced by SPS makes a payment over the online or over the phone ("Pay-to-Pay Transaction"), SPS charges the borrower a Pay-to-Pay Fee of up to $15.00.

36. Typically, a loan servicer will use a vendor to process transaction. But, SPS does not use any vendor or third party to process the transaction. Third-party vendors, Western Union and ACI Worldwide charge other loan servicers $.50 or less per internet or phone transaction. The actual cost to SPS to process the Pay-to-Pay Transactions is a fraction of the amount SPS charged to borrowers, and SPS pockets almost the entire amount as impermissible profit.

37. The Uniform Mortgages of SPS's customers do not authorize SPS to charge Pay-to-Pay Fees. In fact, the Pay-to-Pay Fees violate borrowers' mortgages.

***Named Plaintiff's Facts***

38.     On or January 23, 2008, Steven Lewis Washington and Inez Clara Washington, a married couple, purchased a home in Adelanto, California, through a loan from Bank of America, N.A., secured by a mortgage on the property (the "Deed of Trust"). The Deed of Trust is attached as **Exhibit A.** The Washingtons took out the mortgage loan secured by the property for personal, family, or household uses.

39.     Uniform Fannie Mae/Freddie Mac multistate notes, which are widely used in California, define "Default" as the failure to make a mortgage payment on the due date: "If I do not pay the full amount of e ach monthly payment on the date it is due, I will be in default." **Exhibit B**. The form note also includes a 15-day grace period. On information and belief, which will be confirmed during discovery, Plaintiff's mortgage is secured by a Note containing materially identical provisions.

40.     Fannie Mae and Freddie Mac assign servicing rights with restrictions on the fees that a loan servicer may charge.  On information and belief, Fannie Mae or Freddie Mac assigned Ms. Washington's loan to SPS.  Every loan servicing assignment from Fannie Mae or Freddie Mac is made under the restrictions of Fannie Mae Guidelines for Single Family Loans (the "Guidelines").   The Guidelines prohibit Pay-to-Pay Fees as an illegal fee for "facilitating routine borrower collections" and even if the Guidelines allowed a fee, SPS must keep written policies that explain how the amount of the fee related to the actual cost of providing the service.  Considering the low cost of the service, SPS's Pay-to-Pay Fee amounts are unrelated to the actual cost of providing the service to borrowers.

41.     By letter dated November 5, 2019, Ms. Washington received notice that SPS was assigned the servicing rights to the loan. As servicer, SPS has the right to collect payments and perform services for the borrower on behalf of the lender. The Deed of Trust provides that the "Loan Servicer" possesses a "partial interest in" the Note, which may be transferred. *See* Ex. A ¶ 20. The Deed of Trust further provides that "[t]he covenants and agreements of this Security Instrument shall bind (except as provided in section 20) and benefit the successors and assigns of Lender." Ex. A ¶ 13.[1]

---

[1] Section (or Paragraph) 20 provides: "The note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might

42. SPS became bound as an assignee to the Deed of Trust at the time it acquired the servicing rights. In order for SPS to exercise rights under the Deed of Trust to collect Ms. Washington's mortgage payments, there must be an assignment of mortgage servicing rights.

43. SPS set up and on-boarded the Ms. Washington's loan on November 8, 2019 as a "New Loan Set-Up." At that time, Ms. Washington's loan was at least 38 days delinquent.

44. On the same day, November 8, 2019, SPS charged Ms. Washington a late fee of $20.66.

45. Under the terms of the Deed of Trust, collection costs may only be charged in connection with a default. Ex. A, ¶ 14.

46. When SPS acquired the serving rights right to collect payments and perform services for the borrower on behalf of the lender, Ms. Washington's loan was in default as evidenced by the SPS statement dated November 15, 2019 (the "November Statement") which stated that "as of November 15, you are 45 days delinquent on your mortgage loan." Ms. Washington's November and December statements are enclosed as **Exhibit C**.

47. On November 14, 2019, Ms. Washington made a loan payment over the phone in the amount of $206.67 and was charged a Pay to Pay Fee in the amount of $15.00. According to SPS, this payment satisfied the payment due September 1, 2019.

48. On December 13, 2019, Ms. Washington made a loan payment over the phone in the amount of $206.67 and was charged a Pay to Pay Fee in the amount of $15.00. According to SPS, this payment satisfied the payment due October 1, 2019.

49. In accordance with the statement from SPS dated April 14, 2020 (the "April Statement"), the Ms. Washington made loan payments on January 13, 2020 (which satisfied the

---

result in a change in the entity (known as the "Loan Servicer") that collects periodic payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There might also be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change under the Loan Servicer, Borrower will be given written notice of the change . . . . If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser." Ex. A ¶ 20.

payment due November 1, 2019), February 15, 2020 (which satisfied the payment due December 1, 2019),  and March 11, 2020 (which satisfied the payment due January 1, 2020) and were charged Pay to Pay Fees each time they made these payments. The April Statement is attached as **Exhibit D**.

50.     The April Statement advised Ms. Washington that "as of April 14, 2020, you are 73 days delinquent on your mortgage loan. *See* Ex. D.

51.     Plaintiff's mortgage payments are due on the 1st of the month each and every month, and a late charge will be assessed if payments are not received during the 15-day grace period. Each of Ms. Washington's payments on November 14, 2019, December 13, 2019, January 13, 2020, February 15, 2020, and March 11, 2020, were made on past-due amounts and after the grace period, and while the mortgage was due and owing.

52.     SPS collects the Pay-to-Pay Fees even though it knows that such fees are not authorized under the Deed of Trust and that it therefore has no right to collect them.

53.     Like other borrowers whose mortgages are serviced by SPS, Plaintiff's Deed of Trust incorporates standard language from Fannie Mae model mortgages.  And like other Fannie Mae mortgages, the Deed of Trust states that the servicer "may not charge fees that are expressly prohibited by this Security Instrument, or by Applicable Law." Ex. A ¶ 14.

54.     "Applicable Law" is defined as "all controlling applicable federal, state and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A at 2, ¶ (J).

55.     The Deed of Trust further states that it is "governed by federal law and the law of the jurisdiction in which the Property is located," *i.e.*, California. Ex. A ¶ 16.

56.     Charging Pay-to-Pay Fees not authorized by the Deed of Trust violated the Rosenthal Act, *i.e.*, California law. *See* Cal. Civ. Code §§ 1788.13(e), 1788.14(b), 1788.17.

57.     Charging Pay-to-Pay Fees not authorized by the Deed of Trust also violated the federal FDCPA.

58.     By collecting Pay-to-Pay Fees in violation of "Applicable Law," *i.e.*, the Rosenthal Act and the federal FDCPA, SPS breached the uniform covenants of the Deed of Trust.

59.     Even if SPS was somehow permitted to collect a fee under the auspice that it is a default related fee, under Paragraph 9 of the Deed of Trust, SPS's demand for payment of Pay-to-Pay Fees was and is a direct breach of that paragraph, too.

60.     Paragraph 9 of the Deed of Trust states that only "amounts *disbursed* by Lender under this Section 9 shall become an additional debt of Borrower secured by this Security Instrument." *See* Ex. A ¶ 9 (emphasis added).

61.     SPS collected more than the amount they disbursed to process the Pay-to-Pay Transactions.

62.     SPSs' collection of Pay-to-Pay Fees violated both the Rosenthal Act and the FDCPA.

63.     The above paragraphs are contained in the Uniform Covenants section of the Deed of Trust. SPS thus breached its contracts on a class-wide basis.

64.     Prior to filing this Complaint, Ms. Washington made a written pre-suit demand upon SPS.

65.     SPS was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so.

## CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action on behalf of the following classes of persons, subject to modification after discovery and case development:

**The California Class:**
All persons (1) with a residential mortgage loan securing a property in California, (2) serviced or subserviced by SPS, (3) and who paid a fee to SPS for making a loan payment by telephone, IVR, at an ATM, or the internet, during the applicable statutes of limitations through the date a class is certified.

**The Nationwide Class:**
All persons (1) with a residential mortgage securing property, (2) serviced or subserviced by SPS, (3) which were in default on their loan payment obligations at the time SPS acquired servicing rights, (4) and who paid a fee to SPS for making a loan payment by telephone, IVR, or the internet, during the applicable statutes of limitations for Plaintiff's FDCPA claim through the date a class is certified.

67.     Class members are identifiable through Defendant's records and payment databases.

68.     Excluded from the class are the Defendant; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

69.     Plaintiff proposes that she serve as class representatives.

70.     Plaintiff and the Class have all been harmed by the actions of Defendant.

71.     Numerosity is satisfied. There are thousands of class members.  Individual joinder of these persons is impracticable.

72.     There are questions of law and fact common to Plaintiff and to the Class, including, but not limited to:

      a.      Whether SPS assessed Pay-to-Pay Fees on Class members;

      b.      Whether SPS breached its contracts with borrowers by charging Pay-to-Pay Fees not authorized by their Deed of Trusts;

      c.      Whether SPS violated the Rosenthal Act by charging Pay-to-Pay Fees not due;

      d.      Whether SPS violated the FDCPA by charging Pay-to-Pay Fees not due;

      e.      Whether SPS violated the UCL;

      f.      Whether SPS's business practices are unfair;

      g.      Whether SPS's business practices are unlawful;

      h.      Whether SPS's cost to process Pay-to-Pay Transactions is less than the amount that it charged for Pay-to-Pay Fees;

      i.      Whether Plaintiff and the Class were damaged by SPS's conduct;

      j.      Whether Plaintiff and the Class are entitled to actual and/or statutory damages as a result of SPS's actions;

      k.      Whether Plaintiff and the Class are entitled to restitution;

      l.      Whether Plaintiff and the Class are entitled to attorney's fees and costs.

73.     Plaintiff's claims are typical of the claims of the Class members. SPS charged her Pay-to-Pay Fees in the same manner as the rest of the Class members. Plaintiff and the Class members entered into uniform covenants in their Deed of Trusts that prohibit Pay-to-Pay charges or, at most, cap

the amount of Pay-to-Pay Fees allowed to be charged at the actual amount disbursed by SPS to process Pay-to-Pay Transactions.

74.     Plaintiff is an adequate class representative because her interests do not conflict with the interests of the class members and she will adequately and fairly protect the interests of the class members. Plaintiff has taken actions before filing this amended complaint, by hiring skilled and experienced counsel, and by making a pre-suit demand on behalf of class members to protect the interests of the class.

75.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of this controversy.

76.     The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**<u>COUNT I</u>**
**Violation of the Rosenthal Fair Debt Collection Practices Act**
**Cal. Civ. Code §§ 1788 *et seq.* (Rosenthal Act)**
**On behalf of Plaintiff and the California Class**

77.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

78.     The Rosenthal Act applies to SPS because it regularly engages in debt collection as defined by the statute. Cal. Civ. Code § 1788.2.

79.     SPS knew that the Pay-to-Pay Fees were not expressly set out in the Deed of Trust or the Deed of Trusts of the other Class Members, yet it collected them anyway.

80.     The Rosenthal Act makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

81. By assessing Pay-to-Pay Fees, SPS represented that the mortgage loan debts of Plaintiff and the Class Members may be increased by the addition of the Pay-to-Pay Fees, even though Pay-to-Pay Fees may not be legally added to the existing obligation.

82. This conduct violated the Rosenthal Act.

83. The Rosenthal Act also prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

84. When SPS collected Pay-to-Pay Fees from Plaintiff and the Class Members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

85. By charging Pay-to-Pay Fees, a portion of which it retains, SPS acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

86. The Deed of Trusts of Plaintiff and the Class Members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

87. Although the Deed of Trusts of Plaintiff and the Class Members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

88. In so doing, SPS violated 15 U.S.C. § 1692f.

89.     The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17. By violating the federal FDCPA, SPS violated the Rosenthal Act

90.     Plaintiff and the Class Members were harmed when SPS violated the Rosenthal Act through the above-described conduct.

91.     As a result of each and every violation of the Rosenthal Act, Plaintiff and the Class Members are entitled to any actual damages pursuant to Cal. Civ. Code § 1788.30(a); statutory damages for a knowing or willful violation, pursuant to Cal. Civ. Code §§ 1788.30(b), 1788.17, and 1788.32, to the full extent provided by law; and reasonable attorneys' fees and costs under Cal. Civ. Code § 1788.30(c).

## COUNT II
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### On behalf of Plaintiff and the California Class

92.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

93.     The California Unfair Competition Law "UCL" defines unfair business competition to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code § 17200.

### Unlawful Prong

94.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

95.     SPS's conduct violates the Rosenthal Act and the FDCPA. These violations are sufficient to support Plaintiff's and the California Class's claim under the unlawful prong of the UCL.

96.     The Rosenthal Act applies to SPS because it regularly engages in debt collection as defined by the statute. Cal. Civ. Code § 1788.2.

97. SPS knew that the Pay-to-Pay Fees were not expressly set out in the Deed of Trust or the Deed of Trusts of the other California Class Members, yet it collected them anyway.

98. The Rosenthal Act makes it illegal to represent that consumer debt "may be increased by the addition of . . . charges if, in fact, such fees and charges may not be legally added to the existing obligation." Cal. Civ. Code § 1788.13(e).

99. By assessing Pay-to-Pay Fees, SPS represented that the mortgage loan debts of Plaintiff and the California Class Members may be increased by the addition of the Pay-to-Pay Fees, even though Pay-to-Pay Fees may not be legally added to the existing obligation.

100. This conduct violated the Rosenthal Act.

101. The Rosenthal Act also prohibits "collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law." Cal. Civ. Code § 1788.14.

102. When SPS collected Pay-to-Pay Fees from Plaintiff and the California Class Members, it collected (or attempted to collect) fees or charges for services rendered that were not permitted by law. This conduct violated the Rosenthal Act.

103. By charging Pay-to-Pay Fees, a portion of which it retains, SPS acted in violation of the federal Fair Debt Collection Practices Act, which prohibits "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

104. The Deed of Trusts of Plaintiff and the California Class Members do not expressly authorize SPS to collect Pay-to-Pay Fees. At most, the Uniform Mortgages permit SPS to collect the actual amount disbursed to process the Pay-to-Pay Transactions.

105.    Although the Deed of Trusts of Plaintiff and the California Class Members do not expressly authorize collection of Pay-to-Pay Fees, SPS collected such fees anyway.

106.    In so doing, SPS violated 15 U.S.C. § 1692f.

107.    The Rosenthal Act makes it illegal for any entity covered by the Rosenthal Act to violate the federal FDCPA. Cal. Civ. Code § 1788.17. By violating the federal FDCPA, SPS violated the Rosenthal Act

108.    As a result of the above conduct, Plaintiff and the California Class have suffered economic injury, and SPS has been unjustly enriched at their expense. SPS has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

109.    Through its unlawful acts and practices, SPS has improperly obtained money from Plaintiff and the members of the California Class. As such, Plaintiff requests that the Court cause SPS to restore the money to Plaintiff and the California Class and enjoin SPS from continuing to violate the Rosenthal Act, FDCPA, and UCL. Plaintiff's mortgage continues to be serviced by SPS, and she intends to make mortgage payments over the phone and online in the future. Absent an injunction, Plaintiff and the California Class Members may be irreparably harmed and/or denied an effective and complete remedy.

**Unfair Prong**

110.    In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

111.    SPS's actions constitute "unfair" business practices because, as alleged above, SPS engaged in the immoral, unethical, oppressive, and unscrupulous practice of charging Pay-to-Pay Fees

not authorized by the Uniform Mortgages or applicable law. SPS's unfair practice was substantially injurious to consumers, who were forced to pay $5 each time they wished to make payments by phone. Because SPS charged fees well above the actual cost of providing phone payment services, there are no countervailing benefits to consumers or competition that outweigh the injuries suffered by Plaintiff and the California Class.

112.   As a result of the above conduct, Plaintiff has suffered economic injury, and SPS has been unjustly enriched at the expense of Plaintiff and members of the California Class. SPS has been unjustly enriched by obtaining revenues and profits that it would not have obtained otherwise absent its unlawful conduct.

113.   Through its unlawful acts and practices, SPS has improperly obtained money from Plaintiff and the California Class Members. As such, Plaintiff requests that the Court cause SPS to restore the money to Plaintiff and the California Class and enjoin SPS from continuing to violate the UCL in the future. Plaintiff's mortgage continues to be serviced by SPS, and she intends to make mortgage payments over the phone or online in the future. Absent an injunction, Plaintiff and the California Class Members may be irreparably harmed and/or denied an effective and complete remedy.

**COUNT III**
**Violation of The**
**Fair Debt Collection Practices Act §§ 1692e, 1692f**
**On behalf of Plaintiff and the Nationwide Class**

114.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

115.   Plaintiff and the Nationwide Class members are "consumers" as defined by 15 U.S.C. § 1692a(3) because Plaintiff and the Nationwide Class members purchased homes by mortgage primarily for personal, family, or household use.

116.   SPS is a "debt collector" as defined by 15 U.S.C. § 1692a(6) because as a servicer it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another. Also,

SPS began servicing Plaintiff's mortgage while it was in default, according to the terms of Plaintiff's note and mortgage, so none of the exceptions under 15 U.S.C. § 1692a applies.

117.    SPS is a "debt collector" as defined by 15 U.S.C. § 1692a(6) on Plaintiff's loan because every month it collected Plaintiff's loan payments on behalf of the Plaintiff's lender.

118.    SPS does not enjoy any "safe harbor" protection for loan servicers because it acquired the rights to service Plaintiff's loan at a time when plaintiff was at least 38 days delinquent and was in default according to the terms of the Note. SPS acquired the loans of the Nationwide Class members while they were in default.

119.    Moreover, SPS on-boarded the loan and on the same day charged Plaintiff a late fee of $20.66.  Under the terms of the Note a late fee may only be charged when Plaintiff is in default.

120.    SPS violated 15 U.S.C. § 1692f when it collected Pay-to-Pay Fees not owed and not expressly authorized by the agreement creating the debt and in excess of the amount disbursed, from Plaintiff and the Nationwide Class members, inuring a benefit to SPS.

121.    SPS violated 15 U.S.C. § 1692e(2)(A) when it misrepresented the amount, character, and status of the Plaintiff's and the Nationwide Class members' mortgage debt.

122.    As a result of SPS's violation of 15 U.S.C. §§ 1692e–f, Plaintiff and the Nationwide Class members were harmed monetarily and are entitled to actual damages, plus statutory damages under 15 U.S.C. § 1692k, together with reasonable attorney's fees and costs.

### COUNT IV
**Breach of Contract**
**On Behalf of Plaintiff and the California Class**

123.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

124.    Plaintiff and the California Class Members entered into contracts with SPS. SPS breached its contracts with Plaintiff and the California Class Members when it charged Pay-to-Pay Fees

1    not agreed to in their Deed of Trusts, specifically prohibited by their Deed of Trusts, and in excess of

2    the amounts actually disbursed by SPS to pay for the cost of Pay-to-Pay Transactions.

3       125.    Plaintiff purchased a home subject to the Deed of Trust. *See* Ex. A.

4       126.    At some point, SPS was assigned the servicing rights to the loan. As servicer, SPS has

5    the right to collect payments and perform services for the borrower on behalf of the lender. The Deed of

6    Trust provides that the loan servicer possesses a "partial interest in" the Note, which may be

7    transferred. *See* Ex. A ¶ 20. The Deed of Trust further provides that "[t]he covenants and agreements of

8    this Security Instrument shall bind (except as provided in section 20) and benefit the successors and

9    assigns of Lender." Ex. A ¶ 13. SPS thus became bound as an assignee to the Deed of Trust at the time

10   it acquired the servicing rights to the subject mortgage loan.

11      127.    Each time Plaintiff make mortgage payments over the phone or online, SPS charges her

12   a Pay-to-Pay Fee. On November 14, 2019, December 13, 2019, January 13, 2020, February 15, 2020

13   and March 11, 2020, SPS charged Plaintiff a $15.00 Pay-to-Pay Fee for making a payment online or

14   over the phone.

15      128.    Fannie Mae, in assigning the loan to SPS, restricts the fees that SPS may collect under the

16   assignment through the Guidelines.  The Guidelines prohibit any fee for "facilitating routine borrower

17   collections."  Even if any fee may be charged, SPS may only collect a fee for "special services" and the

18   Guidelines require SPS to keep written policies concerning how the amount of the fee relates to the

19   actual cost of providing the service.  Here, SPS's Pay-to-Pay Fees do not relate to the actual cost of SPS

20   providing the Pay-to-Pay service.

21      129.    These fees were not authorized by the Deed of Trust.

22      130.    Like other borrowers whose mortgages are serviced by SPS, Plaintiff's Deed of Trust

23   incorporates standard language from Fannie Mae model mortgages.  And like other Fannie Mae

24   mortgages, the Deed of Trust states that the servicer "may not charge fees that are expressly prohibited

25   by this Security Instrument, or by Applicable Law." Ex. A ¶ 14.

26      131.    The Deed of Trust states that "[t]his Security Instrument shall be governed by federal law

27   and the law of the jurisdiction in which the Property is located," i.e., California. Ex. A ¶ 16. It further

states that "Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law." *Id*. ¶ 14.

132.   "Applicable Law" is defined as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A at 2 ¶ (J).

133.   Charging Pay-to-Pay Fees not authorized by the Deed of Trust violated the Rosenthal Act, i.e., California law. *See* Cal. Civ. Code §§ 1788.13(e), 1788.14(b), 1788.17. It also violated the federal FDCPA.

134.   By collecting Pay-to-Pay Fees in violation of "Applicable Law," i.e., the Rosenthal Act and the federal FDCPA, SPS breached the uniform covenants of the Deed of Trust.

135.   Even if the Pay-to-Pay Fees could somehow be construed as a default-related fee under ¶ 9, "Protection of Lender's Interest in the Property and Rights Under This Security Instrument" section, that section permits only "amounts *disbursed* by lender" to become the debt of the borrower. *See* Ex. A ¶ 9 (emphasis added). By assessing more than the amounts it actually disbursed to the balance of Plaintiff's mortgage, SPS violated Paragraph 9 of the Deed of Trust.

136.   Because the above provisions are contained in the "Uniform Covenants" section of the Deed of Trust, SPS has breached their contracts on a class-wide basis.

137.   Plaintiff and the members of the Class were damaged by SPS's breach.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of herself and others similarly situated, respectfully request that the Court:

138.   Certify the proposed Classes;

139.   Award damages, including compensatory damages, to Plaintiff and the Class in an amount to be determined at trial;

140.   Award statutory damages and/or penalties to Plaintiff and the Class;

141.   Permanently enjoin SPS from the wrongful and unlawful conduct alleged herein;

142.    Award Plaintiff and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

143.    Award pre- and post-judgment interest to the extent provided by law; and

144.    Award such further relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated: August 24, 2020                    Respectfully Submitted,


Hassan A. Zavareei (SBN 181547)
Kristen G. Simplicio (SBN 263291)
TYCKO & ZAVAREEI LLP
1828 L Street NW, Suite 1000
Washington, D.C. 20036
Telephone: 202-973-0900 (p)
Facsimile: 202-973-0950 (f)
hzavareei@tzlegal.com
ksimplicio@tzlegal.com


Todd A. Walburg (SBN 213063)
BAILEY & GLASSER LLP
475 14th Street, Suite 610
Oakland, California 94612
Telephone: (510) 207-8633
Facsimile: (510) 463-0241
twalburg@baileyglasser.com

*Counsel for Plaintiff and the Proposed Class*

# EXHIBIT

# **A**

Case: RECORDING REQUESTED BY/SP Document 59-13 Filed 03/24/2010 Page 24 of 66 Page ID #:2225
FIRST AMERICAN TITLE COMPANY     Electronically Recorded in Official Records, County of San Bernardino     1/29/2008
SUBDIVISION DEPARTMENT                                                                                              12:38 PM
                                                                                                                   LMJ

Recording Requested By:
BANK OF AMERICA

**LARRY WALKER**
Auditor/Controller - Recorder

**828 First American Title - Rancho**

Return To:
LOAN # 6805982516
FL9-700-01-01
JACKSONVILLE POST CLOSING
BANK OF AMERICA
9000 SOUTHSIDE BLVD.
BLDG 700, FILE RECEIPT DEPT.
JACKSONVILLE, FL 32256

| Doc #: | **2008-0036399** | Titles: | 1 | Pages: | 17 |
|---|---|---|---|---|---|
| | | Fees | | | 58.00 |
| | | Taxes | | | .00 |
| | | Other | | | .00 |
| | | PAID | | | 58.00 |

2781(32-11

APN 3128-501-03-0-000
+RA 01419

[Space Above This Line For Recording Data]

# DEED OF TRUST

LOAN #6805982516

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated     JANUARY 23, 2008     ,
together with all Riders to this document.
**(B) "Borrower"** is STEVEN LEWIS WASHINGTON AND INEZ CLARA WASHINGTON

Borrower's address is     451 E RIVERSIDE AVE, ONTARIO, CA  91761

. Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is  BANK OF AMERICA, N.A.

Lender is a  NATIONAL BANKING ASSOCIATION
organized and existing under the laws of  THE UNITED STATES OF AMERICA

**CALIFORNIA** – Single Family

Page 1 of 15

**BS6(CA)** (0207)                         VMP Mortgage Solutions (800)521-7291
    CVCA 01/23/08 5:43 PM 6805982516

Lender's address is 275 S.VALENCIA AVE. 1ST FLOOR, BREA, CA 928236340

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  PRLAP, INC.

(E) "Note" means the promissory note signed by Borrower and dated  JANUARY 23, 2008
The Note states that Borrower owes Lender FORTY NINE THOUSAND NINE HUNDRED NINETY
EIGHT AND 00/100                                                            Dollars
(U.S. $       49,998.00     ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2023
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                of SAN BERNARDINO                                :

        [Type of Recording Jurisdiction]                                [Name of Recording Jurisdiction]
"SEE ATTACHED EXHIBIT A."

Parcel ID Number: 3128501030000, 3128501090000                  which currently has the address of
15849 MCVAY LANE                                                                                          [Street]
ADELANTO                                                        [City] , California 92301        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

**BS6(CA)** (0207)                                       Page 5 of 15
CVCA 01/23/08 5:43 PM 6805982516

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

**BS6(CA)** (0207)

CVCA 01/23/08 5:43 PM 6805982516

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

    **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

    Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

    **21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

    Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

    Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          STEVEN LEWIS WASHINGTON      -Borrower


_____          _____ (Seal)
                                          INEZ CLARA WASHINGTON        -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                     -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                     -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                     -Borrower


**BSB(CA)** (0207)                         Page 14 of 15
CVCA 01/23/08 5:43 PM 6805982516

State of California
County of San Bernardino            } ss.

On 01·24·2008                    before me, J. Perez-notary Public
                                                  personally appeared

Steven L. Washington And
Inez C. Washington

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

_____ (Seal)

J. PEREZ
COMM. #1786623
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Dec. 23, 2011

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA      }

COUNTY OF San Bernardino   }

On 01-24-08 _____, before me, J. Perez _____, Notary Public,
personally appeared Steven L. Washington And Inez C. Washington _____
_____ who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

J. PEREZ
COMM. #1786623
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Dec. 23, 2011

---

## OPTIONAL SECTION
## CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on
the document.

[ ]   Individual

[ ]   Corporate Officer(s) _____ Title(s)

[ ]   Partner(s)  [ ] Limited  [ ] General

[ ]   Attorney-In-Fact

[ ]   Trustee(s)

[ ]   Guardian/Conservator

[ ]   Other _____

**SIGNER IS REPRESENTING:**

_____    _____
Name of Person or Entity        Name of Person or Entity

---

## OPTIONAL SECTION

Though the date requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

Title or Type of Document: _____

Number of Pages: _____    Date of Document: _____

Signer(s) Other Than Named Above: _____



**LEGAL DESCRIPTION**

Real property in the City of Adelanto, County of San Bernardino, State of California, described as follows:

LOT 60 OF TRACT NO. 16930-1, IN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 327, PAGES 29 THROUGH 32 OF MAPS, RECORDS OF SAID COUNTY.

Electronically recorded in Official Records, County of San Bernardino
12:38 PM
LMJ

Recording Requested By:
BANK OF AMERICA

Return To:
LOAN # 6110306914
FL9-700-01-01
JACKSONVILLE POST CLOSING
BANK OF AMERICA
9000 SOUTHSIDE BLVD.
BLDG 700, FILE RECEIPT DEPT.
JACKSONVILLE, FL 32256



**LARRY WALKER**
Auditor/Controller - Recorder

**828 First American Title - Rancho**

Doc #: **2008-0036398**

| Titles: | 1 | Pages: 17 |
|---|---|---|
| Fees | | 58.00 |
| Taxes | | .00 |
| Other | | .00 |
| PAID | | 58.00 |

2 781132 -11

APN 3178-501-63-0-000

TRA 01419

——————— [Space Above This Line For Recording Data] ———————

# DEED OF TRUST

LOAN #6110306914

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    JANUARY 23, 2008    , together with all Riders to this document.

(B) "Borrower" is STEVEN LEWIS WASHINGTON AND INEZ CLARA WASHINGTON

Borrower's address is    451 E RIVERSIDE AVE, ONTARIO, CA  91761

. Borrower is the trustor under this Security Instrument.

(C) "Lender" is  BANK OF AMERICA, N.A.

Lender is a  NATIONAL BANKING ASSOCIATION
organized and existing under the laws of   THE UNITED STATES OF AMERICA

**CALIFORNIA** – Single Family

**BS6(CA)**  (0207)          VMP Mortgage Solutions (800)521-7291
CVCA 01/23/08 5:43 PM 6110306914

Lender's address is 275 S.VALENCIA AVE. 1ST FLOOR, BREA, CA 928236340

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  PRLAP, INC.

(E) "Note" means the promissory note signed by Borrower and dated ` JANUARY 23, 2008
The Note states that Borrower owes Lender ONE HUNDRED NINETY NINE THOUSAND NINE
HUNDRED NINETY TWO AND 00/100                                            Dollars
(U.S. $      199,992.00   ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2038        .
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late·
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower (check box as applicable):

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
|---|---|---|
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                of SAN BERNARDINO                      :
          [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
"SEE ATTACHED EXHIBIT A."

Parcel ID Number: 3128501030000,3128501090000                    which currently has the address of
15849 MCVAY LANE                                                               [Street]
ADELANTO                                           [City] , California 92301        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

**BS6(CA)** (0207)

Page 12 of 15

CVCA 01/23/08 5:43 PM 6110306914

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

BS6(CA)  (0207)

Page 13 of 15

CVCA 01/23/08 5:43 PM 6110306914

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____            _____ (Seal)
                                            STEVEN LEWIS WASHINGTON        -Borrower

_____            _____ (Seal)
                                            INEZ CLARA WASHINGTON          -Borrower

_____ (Seal)             _____ (Seal)
               -Borrower                                   -Borrower

_____ (Seal)             _____ (Seal)
               -Borrower                                   -Borrower

_____ (Seal)             _____ (Seal)
               -Borrower                                   -Borrower

State of California
County of San Bernardino                          } ss.

On 01-24-2008                    before me, J. Perez - notary public
                                                   personally appeared

Steven L. Washington and
Inez C. Washington

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

_____ (Seal)

J. PEREZ
COMM. #1786623
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Dec. 23, 2011

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

STATE OF CALIFORNIA                              }

COUNTY OF San Bernardino                         }

On 01-24-2008                    , before me,  J. Perez                    , Notary Public,
personally appeared Steven L. Washington And Inez C. Washington
_____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

J. PEREZ
COMM. #1786623
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Dec. 23, 2011

## OPTIONAL SECTION
## CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on
the document.

[  ]    Individual

[  ]    Corporate Officer(s) _____    Title(s)

[  ]    Partner(s)   [  ] Limited   [  ] General

[  ]    Attorney-In-Fact

[  ]    Trustee(s)

[  ]    Guardian/Conservator

[  ]    Other _____

**SIGNER IS REPRESENTING:**

_____          _____
Name of Person or Entity                          Name of Person or Entity

## OPTIONAL SECTION

Though the date requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

Title or Type of Document: _____

Number of Pages: _____    Date of Document: _____

Signer(s) Other Than Named Above: _____



**LEGAL DESCRIPTION**

Real property in the City of Adelanto, County of San Bernardino, State of California, described as follows:

LOT 60 OF TRACT NO. 16930-1, IN THE CITY OF ADELANTO, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 327, PAGES 29 THROUGH 32 OF MAPS, RECORDS OF SAID COUNTY.

EXHIBIT

**B**

# NOTE

_____, _____       _____, _____
[Date]                                    [City]          [State]

_____
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $_____ (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is _____

_____. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of _____ %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the _____ day of each month beginning on _____, _____. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on _____, 20____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at _____

_____ or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $_____.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**MULTISTATE FIXED RATE NOTE**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**       Form 3200  1/01  _(page 1 of 3 pages)_

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of _____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _____ % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
                                            - Borrower

_____(Seal)
                                            - Borrower

_____(Seal)
                                            - Borrower

*[Sign Original Only]*

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3200   1/01 *(page 3 of 3 pages)*

# EXHIBIT

# C

**SPS** SELECT Portfolio SERVICING, INC.
P.O. Box 65250
Salt Lake City, UT 84165-0250
www.spservicing.com

Customer Service: (800) 258-8602
Monday - Thursday 8:00AM - 11:00PM ET
Friday 8:00AM - 9:00PM ET
Saturday 8:00AM - 2:00PM ET

*For other important information, see reverse side*

Steven L. Washington
Inez C Washington
15849 McVay Ln
Adelanto, CA 92301-6307

| Account Number | ████328 |
| Property Address | 15849 MCVAY LANE |
| | ADELANTO CA 92301 |
| Loan Due Date | 10/01/2019 |
| Payment Due Date | 12/01/2019 |
| Amount Due | $609.68 |
| *If payment is received after 12/16/2019, $10.33 late fee will be charged* | |

### Explanation of Amount Due

| | |
|---|---|
| Principal | $52.26 |
| Interest | $154.41 |
| Escrow (Taxes and Insurance) | $0.00 |
| **Regular Monthly Payment** | $206.67 |
| Charges / Fees this Period | $35.66 |
| Past Due Payment(s) | $413.34 |
| Unapplied Payment(s) | $10.33 |
| **Total Amount Due** | **$609.68** |

### Account Information

| | |
|---|---|
| Interest Bearing Principal | $42,457.34 |
| Deferred Principal | $6,628.71 |
| Outstanding Principal [1] | $49,086.05 |
| Unpaid Late Charges | $20.66 |
| Other Charges and Fees | $0.00 |
| Interest Rate (Fixed) | 4.375% |
| Prepayment Penalty | No |

### Transaction Activity (09/01/2019 to 11/15/2019)

| Date | Description | Principal Balance | Interest | Taxes & Insurance | Late Charges | Unapplied Balance | Other Fees | Total [1] |
|---|---|---|---|---|---|---|---|---|
| 09/01 | BEG BALANCE | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 11/08 | NEW LOAN SET-UP | 49,137.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 49,137.74 |
| 11/08 | FEE ADJUSTMENT | 0.00 | 0.00 | 0.00 | 20.66 | 0.00 | 0.00 | 20.66 |
| 11/08 | DISTRIBUTED FUNDS | 0.00 | 0.00 | 0.00 | 0.00 | (10.33) | 0.00 | (10.33) |
| 11/14 | PAYMENT | (51.69) | (154.98) | 0.00 | 0.00 | 0.00 | 0.00 | (206.67) |
| 11/14 | EZ PAY FEE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 | 15.00 |
| 11/14 | EZ PAY FEE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (15.00) | (15.00) |
| 11/15 | ENDING BALANCE | $49,086.05 | $309.39 | $0.00 | $20.66 | ($10.33) | $0.00 | $49,405.77 |

### Past Payments Breakdown

| | Paid Last Month | Paid Year To Date |
|---|---|---|
| Principal | $51.69 | $51.69 |
| Interest | $154.98 | $154.98 |
| Escrow (Taxes and Insurance) | $0.00 | $0.00 |
| Fees and Other Charges | $15.00 | $15.00 |
| Partial Payment (Unapplied) | $10.33 | |
| Total | $232.00 | $221.67 |
| Total Unapplied Balance | | $10.33 [3] |

### **Delinquency Notice**

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure — the loss of your home.

As of November 15, 2019, you are 45 days delinquent on your mortgage loan.
* Payment due 11/2019: Unpaid payment of $206.67.
* Payment due 10/2019: Unpaid payment of $206.67.
* Payment due 09/2019: Fully paid on 11/14/2019.

Total: $609.68 due. You must pay this amount to bring your loan current.

If You Are Experiencing Financial Difficulty: See the back for information about mortgage counseling or assistance. Also, there are a number of options available to assist customers who are experiencing difficulty with their payments. Please contact us immediately to discuss these options, arrange a reinstatement or address any questions regarding the statement at (888) 818-6032.

### Important Messages

[1] This amount is not a payoff quote. If you would like a payoff quote, please see instructions on reverse side.

[3] Partial payments or overpayments are treated as unapplied funds until we receive enough for a full principal and interest payment at which time we will credit your account for the principal and interest payment.

Any transactions that occurred after the statement date noted above will be reflected on your next statement.

This is an attempt to collect a debt. All information obtained will be used for that purpose.

---

Please detach bottom portion and return with your payment. Allow 7 - 10 days for postal delivery. Please do not send cash.

### MONTHLY PAYMENT COUPON

| Amount Due | |
|---|---|
| Borrower Name(s) | Steven L Washington |
| | Inez C Washington |
| Account Number | ████328 |

Due By 12/01/2019: $609.68
$10.33 late fee will be charged after 12/16/2019

SELECT PORTFOLIO SERVICING, INC.
PO BOX 65450
SALT LAKE CITY UT 84165-0450

Make checks payable to: Select Portfolio Servicing

| | $ |
|---|---|
| Monthly Payment | |
| Additional Principal | |
| Additional Escrow | |
| Late Fees | |
| Other (Please Specify) | |
| Total Amount Enclosed $ | |

**SPS** Select Portfolio Servicing, Inc. www.spsservicing.com

P.O. Box 65250
Salt Lake City, UT 84165-0250

Customer Service: (800) 258-8602
Monday – Thursday 8:00AM – 11:00PM ET
Friday 8:00AM – 9:00PM ET
Saturday 8:00AM – 2:00PM ET

*For other important information, see reverse side*

Steven L Washington
Inez C Washington
15849 McVay Ln
Adelanto, CA 92301-6307

| Account Number | 328 |
| Property Address | 15849 MCVAY LANE ADELANTO CA 92301 |
| Loan Due Date | 11/01/2019 |
| Payment Due Date | 01/01/2020 |
| Amount Due | $609.68 |

*If payment is received after 01/16/2020, $10.33 late fee will be charged.*

**Explanation of Amount Due**

| | |
|---|---|
| Principal | $52.45 |
| Interest | $154.22 |
| Escrow (Taxes and Insurance) | $0.00 |
| **Regular Monthly Payment** | **$206.67** |
| Charges / Fees this Period | $15.00 |
| Past Due Payment(s) | $413.34 |
| Unapplied Payment(s) | $10.33 |
| **Total Amount Due** | **$609.68** |

**Account Information**

| | |
|---|---|
| Interest Bearing Principal | $42,405.46 |
| Deferred Principal | $6,628.71 |
| Outstanding Principal | $49,034.17 |
| Unpaid Late Charges | $20.66 |
| Other Charges and Fees | $0.00 |
| Interest Rate (Fixed) | 4.375% |
| Prepayment Penalty | No |

**Transaction Activity (11/16/2019 to 12/13/2019)**

| Date | Description | Principal Balance | Interest | Taxes & Insurance | Late Charges | Unapplied Balance | Other Fees | Total |
|---|---|---|---|---|---|---|---|---|
| 11/16 | BEG BALANCE | $49,086.05 | $463.80 | $0.00 | $20.66 | ($10.33) | $0.00 | $49,560.18 |
| 12/13 | PAYMENT | (51.88) | (154.79) | 0.00 | 0.00 | 0.00 | 0.00 | (206.67) |
| 12/13 | EZ PAY FEE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 | 15.00 |
| 12/13 | EZ PAY FEE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | (15.00) | (15.00) |
| 12/13 | ENDING BALANCE | $49,034.17 | $309.01 | $0.00 | $20.66 | ($10.33) | $0.00 | $49,353.51 |

**Past Payments Breakdown**

| | Paid Last Month | Paid Year To Date |
|---|---|---|
| Principal | $51.88 | $103.57 |
| Interest | $154.79 | $309.77 |
| Escrow (Taxes and Insurance) | $0.00 | $0.00 |
| Fees and Other Charges | $15.00 | $30.00 |
| Partial Payment (Unapplied) | $0.00 | |
| **Total** | **$221.67** | **$443.34** |
| Total Unapplied Balance | $10.33 | |

**Important Messages**

¹ This amount is not a payoff quote. If you would like a payoff quote, please see instructions on reverse side.

³ Partial payments or overpayments are treated as unapplied funds until we receive enough for a full principal and interest payment at which time we will credit your account for the principal and interest payment.

Any transactions that occurred after the statement date noted above will be reflected on your next statement.

This is an attempt to collect a debt. All information obtained will be used for that purpose.

The Outstanding Principal balance includes the Interest Bearing Principal balance and the Deferred Principal balance. The Deferred Principal balance is not subject to the charged interest rate and will be due as a final balloon payment on the earlier of (a) payoff of the Interest Bearing Principal balance, or (b) maturity date of the mortgage loan.

Under the Servicemembers Civil Relief Act if you or a family member has been deployed to active duty, you may be eligible for certain protections regarding your mortgage loan. Please contact us at (800) 258-8602 to discuss these protections.

⁴ Loan Due Date: If this date is different from your Payment Due Date, it means that you are past due and owe payments from previous months.

YTD Interest Paid amount will include capitalized interest in the event your loan was modified in the current year.

**Please detach bottom portion and return with your payment. Allow 7 - 10 days for postal delivery. Please do not send cash.**

**MONTHLY PAYMENT COUPON**

Make checks payable to: Select Portfolio Servicing

**Amount Due**

| | |
|---|---|
| Borrower Name(s) | Steven L Washington Inez C Washington |
| Account Number | 328 |

Due By 01/01/2020: $609.68
$10.33 late fee will be charged after 01/16/2020

| | $ |
|---|---|
| Monthly Payment | $ |
| Additional Principal | $ |
| Additional Escrow | $ |
| Late Fees | $ |
| Other (Please Specify) | $ |
| **Total Amount Enclosed** | $ |

SELECT PORTFOLIO SERVICING, INC.
PO BOX 65450
SALT LAKE CITY UT 84165-0450

Change of address or telephone? If so, check here ☐ and note changes on back

2771 0027040328 000000020667 0000021700 6

# EXHIBIT

# **D**

**SPS** | Select Portfolio Servicing, Inc.

P.O. Box 65250
Salt Lake City, UT 84165-0250
www.spservicing.com

Customer Service  (800) 258-8602
Monday - Thursday   8:00AM - 11:00PM ET
Friday                      8:00AM - 9:00PM ET
Saturday                  8:00AM - 2:00PM ET

*For other important information, see reverse side.*

Steven L Washington
Inez C Washington
15849 McVay Ln
Adelanto, CA 92301-6307

| Account Number | ███████328 |
| Property Address | 15849 MCVAY LANE |
| | ADELANTO CA 92301 |
| Loan Due Date | 02/01/2020 |
| Payment Due Date | 05/01/2020 |
| Amount Due | $816.35 |

*If payment is received after 05/16/2020, $10.33 late fee will be charged.*

**Explanation of Amount Due**

| | |
|---|---|
| Principal | $63.22 |
| Interest | $153.45 |
| Escrow (Taxes and Insurance) | |
| **Regular Monthly Payment** | **$206.67** |
| Charges / Fees this Period | $15.00 |
| Past Due Payment(s) | $620.01 |
| Unapplied Payment(s) | $10.33 |
| **Total Amount Due** | **$816.35** |

**Account Information**

| | |
|---|---|
| Interest Bearing Principal | $43,348.68 |
| Deferred Principal | $6,628.71 |
| Outstanding Principal | $48,877.39 |
| Unpaid Late Charges | $20.66 |
| Other Charges and Fees | $149.00 |
| Interest Rate (Fixed) | 4.375% |
| Prepayment Penalty | No |

**Transaction Activity** (03/14/2020 to 04/14/2020)

| Date | Description | Principal Balance | Interest | Taxes & Insurance | Late Charges | Unapplied Balance | Other Fees | Expenses Pd by Servicer | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | $48,877.39 | $461.52 | $0.00 | $20.66 | ($10.33) | $0.00 | $134.00 | $49,483.24 |
| 03/14 | BEG BALANCE | | | | | | | | |
| 04/30 | PROP INSPECTION | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 | 15.00 |
| 04/14 | ENDING BALANCE | $48,877.39 | $461.52 | $0.00 | $20.66 | ($10.33) | $0.00 | $149.00 | $49,498.24 |

**Past Payments Breakdown**

| | Paid Last Month | Paid Year To Date |
|---|---|---|
| Principal | $0.00 | $156.78 |
| Interest | $0.00 | $463.23 |
| Escrow (Taxes and Insurance) | $0.00 | $0.00 |
| Fees and Other Charges | $0.00 | $45.00 |
| Partial Payment (Unapplied) | $0.00 | |
| **Total** | **$0.00** | **$665.01** |
| Total Unapplied Balance | $10.33 ³ | |

**Important Messages**

**COVID-19:** Visit www.spservicing.com for important details on how we are responding to the COVID-19 pandemic, including assistance options that may be available.

¹ This amount is not a payoff quote. If you would like a payoff quote, please see instructions on reverse side.

³ Partial payments or overpayments are treated as unapplied funds until we receive enough for a full principal and interest payment at which time we will credit your account for the principal and interest payment. There may be other options available to you depending on the account's status. If you are interested in learning about other options that might be available to have these funds applied to the account, please contact us at (800) 258-8602.

Any transactions that occurred after the statement date noted above will be reflected on your next statement.

**\*\*Delinquency Notice\*\***

You are late on your mortgage payments. Failure to bring your loan current may result in fees and foreclosure — the loss of your home.

As of April 14, 2020, you are 73 days delinquent on your mortgage loan.

- Payment due 04/2020: Unpaid payment of $206.67
- Payment due 03/2020: Unpaid payment of $206.67
- Payment due 02/2020: Unpaid payment of $206.67
- Payment due 01/2020: Fully paid on 03/11/2020.
- Payment due 12/2019: Fully paid on 02/15/2020.
- Payment due 11/2019: Fully paid on 01/13/2020.

Total: $816.35 due. You must pay this amount to bring your loan current.

If You Are Experiencing Financial Difficulty: See the back for information about mortgage counseling or assistance. Also, there are a number of options available to assist customers who are experiencing difficulty with their payments. Please contact us immediately to discuss these options, arrange a reinstatement or address any questions regarding the statement at (888) 818-6032.

---

Please detach bottom portion and return with your payment. Allow 7 - 10 days for postal delivery. Please do not send cash.

**MONTHLY PAYMENT COUPON**

Make checks payable to: **Select Portfolio Servicing**

**Amount Due**

| Borrower Name(s) | Steven L Washington |
| | Inez C Washington |
| Account Number | ███████328 |

Due By 05/01/2020:  $816.35
$10.33 late fee will be charged after 05/16/2020

| | $ |
|---|---|
| Monthly Payment | |
| Additional Principal | |
| Additional Escrow | |
| Late Fees | |
| Other (Please Specify) | |
| **Total Amount Enclosed** | $ |

SELECT PORTFOLIO SERVICING, INC.
PO BOX 65450
SALT LAKE CITY UT 84165-0450

Change of address or telephone? If so, check here and note changes on back

2771 0027040328 0000020667 0000021700 6